**MUSKEGON MOTOR SPECIALTIES CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9199.

Circuit Court of Appeals, Sixth Circuit.

April 13, 1943.

Archibald Broomfield of Detroit, Mich. (Archibald Broomfield, Melville C. Mason, and Laurence A. Masselink, all of Detroit, Mich., on the brief), for petitioner.

A. A. Armstrong, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, Samuel H. Levy, and Arthur A. Armstrong, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

The petitioner, Muskegon Motor Specialties Company, seeks a review of a decision of the Board of Tax Appeals redetermining deficiencies in its income and excess profits taxes for 1934 in the respective amounts of $5,596.51 and $2,035.10.

Decision turns upon determination of the basis for computing depreciation of petitioner's assets. If the basis was cost at the time of their acquisition, petitioner should prevail; but if the net unrecovered cost to the two companies from which the assets were acquired, the Board's decision must stand.

In 1928 there existed in Michigan the L. O. Gordon Manufacturing Company, engaged in the manufacture of cam shafts and herein called Gordon, with outstanding capital stock of 2,000 shares having a par value of $100, and the Muskegon Motor Specialties Company, engaged in a similar business, herein called Muskegon Michigan, with outstanding capital stock of 4,500%10 shares of no par value. Of Gordon's 2,000 shares, L. O. Gordon, its president, and his wife owned 560 shares; and of Muskegon Michigan's 4,500%10 shares, 2,228 were owned by Flanders Investment Company, a personal holding company of Fred L. Flanders, Muskegon Michigan's president.

On November 7, 1928, a circular letter was sent to the stockholders of Muskegon Michigan, setting out a plan for consolidating Gordon and Muskegon Michigan and stating that it had been unanimously agreed upon by the officers and directors of both companies, by all the stockholders of Gordon, and by 96% of the stockholders of Muskegon Michigan. All of Muskegon Michigan stockholders must ultimately have agreed, since all participated in the merger.

On November 24, 1928, petitioner, a Delaware corporation, was organized "for the purpose of effecting a consolidation of the businesses" of Gordon and Muskegon Michigan with an authorized capital of 62,-500 no par Class A shares, carrying a $2.00 dividend, and 187,500 of no par common. L. O. Gordon was elected petitioner's president and Flanders its treasurer and chairman of the board.

Cash was acquired from the sale to three banks of all the Class A shares and 15,000 of the common stock for $1,385,000; and from the declaration later by Gordon of a $60,000 dividend which had already been assigned to petitioner.

On November 27, 1928, petitioner organized two subsidiary corporations, the Midland Investors, Inc., herein called Midland, and Norton Securities Company, herein called Norton, with stock issues of 5,000 and 3,750 no par shares, respectively. Petitioner purchased the entire issue of Midland for $45 per share, and of Norton for $100 per share.

Using the balance of its cash, some of its own common stock and the entire issues of Midland and Norton, petitioner acquired the entire outstanding stock of Gordon and Muskegon Michigan. To aid petitioner in this purchase, L. O. Gordon had previously obtained options upon the 1,440 shares of Gordon stock which he and his wife did not own; and the Flanders Investment

Company, and other stockholders of Muskegon Michigan, deposited their shares with the Union National Bank of Muskegon Michigan for exchange for cash and stock of petitioner.

On December 6, 1928, these acquisitions were consummated as follows:

Petitioner acquired all of the shares of stock of Gordon in the following detailed manner,—from Gordon and wife 560 shares for which petitioner paid $15,492.40 in cash; 5,000 shares of Midland and 35,000 of its own common; from the other stockholders the 1,440 remaining shares of Gordon for $433,507.60 in cash, Gordon's options thereon having been assigned to petitioner.

On the same date petitioner acquired from Flanders Investment Company 2,228 shares of Muskegon Michigan for $6,652.-23 in cash, the 3,750 shares of Norton, and 37,118⅓ shares of its own common; and from the remaining stockholders of Muskegon Michigan the 2,272⁹/₁₀ remaining shares for $389,346.77 in cash, and 37,881⅔ shares of its own common.

In making these acquisitions petitioner had issued all of its Class A stock and 125,-000 of the 187,500 authorized shares of its no par common, the remaining 62,500 shares of its no par common being reserved for conversion of the Class A shares. Before these acquisitions on December 6, 1928, no former Gordon shareholder had owned any Muskegon Michigan stock, and no former Muskegon Michigan shareholder had owned any Gordon stock. Thereafter no former Gordon or Muskegon Michigan shareholder owned any of petitioner's Class A or any of the 15,000 shares of no par common stock which it had sold to the banks; but the combined holdings of petitioner's common stock by former Gordon and Muskegon Michigan shareholders totaled 110,000 shares.

On January 23, 1929, special meetings of the stockholders and directors of Gordon and Muskegon Michigan were held, which authorized a conveyance of all the properties and assets of each corporation to petitioner upon the assumption by the latter of all the debts and liabilities of each and directing thereafter the dissolution and surrender of the charter of each.

Petitioner claims that in determining depreciation it is entitled to the basis of cost to it of the depreciable properties acquired from Gordon and Muskegon Michigan. This cost, for the depreciable assets ac-

quired from Gordon, was $364,684.10, and for those acquired from Muskegon Michigan, $490,896.88. The Board held that petitioner must use the basis of its predecessors, that is, the unrecovered cost to them, on the date of the transfer, of their assets to petitioner. The unrecovered cost of the Gordon assets on that date was $214,675.51 and of the Muskegon Michigan assets was $23,369.63.

Sec. 114(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 701, provides that the basis for depreciation in respect of any property shall be the adjusted basis provided in Sec. 113(b) thereof, 26 U.S.C.A. Int.Rev.Acts, page 700. This section is made to depend upon Sec. 113(a) which provides "the basis of property shall be the cost of such property" with certain exceptions, number "(12)" of which is relied upon by the Commissioner. This Sec. 113(a) (12) is as follows: "(12) Basis established by Revenue Act of 1932. If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1934, and the basis thereof, for the purposes of the Revenue Act of 1932 was prescribed by section 113 (a) (6), (7), or (9) of such Act, then for the purposes of this Act the basis shall be the same as the basis therein prescribed in the Revenue Act of 1932." This subsection (12) must control in determining the amount of petitioner's deficiencies in income and excess profits taxes for 1934.

The Commissioner's contention is that Sec. 113(a) (7) controls the situation. Pertinent portions thereof follow: "(7) Transfers to corporation where control of property remains in same persons. *If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization; and immediately after the transfer an interest or control in such property of 50 percentum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor*, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *" (Italics ours.)

A "reorganization" is defined in Sec. 112(i) (1) (A) of both the 1928 and 1932 Revenue Acts, 26 U.S.C.A. Int.Rev.Acts, pages 379, 513, as among other things, "a merger or consolidation (including the acquisition by one corporation of at least a

majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)."

Petitioner concedes that the transactions hereinbefore described fall within the literal language of this definition of a reorganization, since petitioner had acquired all of the stock of Gordon and Muskegon Michigan; but insists that under decisions of the Supreme Court and of this and other courts, there must be found in addition a continuity of interest between the old and new corporations, and that the interest of the transferors or their stockholders must represent a substantial part of the value of the thing transferred. Petitioner, among other cases, cites Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; Miller v. Comm'r., 6 Cir., 84 F.2d 415; Banner Mach. Co. v. Routzahn, 6 Cir., 107 F.2d 147; Mascot Stove Co. v. Comm'r., 6 Cir., 120 F.2d 153, and Templeton's Jewelers, Inc., v. United States, 6 Cir., 126 F.2d 251.

■ Petitioner further concedes that there was "some continuity of interest" between Muskegon Michigan stockholders and itself since each of the Muskegon Michigan stockholders received stock in petitioner but denies that the continuing interest represented a substantial part of the value of the thing transferred. We are not in accord.

In Miller v. Comm'r., supra, we pointed out that each case must in its final analysis rest upon its own peculiar facts. We said substantially the same thing in Banner v. Comm'r., supra. In the Miller case we ruled that a controlling interest in the transferee corporation was not necessary to reorganization. In Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355, the court in reviewing several previous decisions as to what constituted a substantial stake of the transferor in the new enterprise, pointed out that such a stake was thought to be retained where a large proportion of the consideration was in common stock of the transferee, citing the Minnesota Tea case, supra.

Here, in addition to cash and other stock, the Muskegon Michigan stockholders received 60% of the issued (40% of the authorized) common stock of a corporation whose transferors had had consolidated earnings averaging over $240,000 for each of the three years before their union in petitioner. Moreover, dividend commitments of the new corporation, which take precedence over common stock, were only $125,000 per year. We think that these potential earnings, plus a large share in the control of petitioner as represented by the common stockholdings, represented substantial value.

Gordon is nearer the border line. Of the 2,000 shares of Gordon which were transferred by stockholders to petitioner, 1,440 were paid for in cash. Gordon and wife, representing 560 shares of Gordon, became stockholders in petitioner. However, their common stockholdings therein, over and above payments to them in cash and other stock, were 35,000 shares. This represented more than 25% of petitioner's issued common stock and 18⅔% of the authorized stock. Its potential earnings and the voice it gave its owners in management, coupled with L. O. Gordon's presidency of petitioner, constitute a "substantial stake" therein.

■ We conclude that these transactions establish a "reorganization" within the meaning of Sec. 112(i) (1) (A).

We come now to the question, whether under Sec. 113(a) (7), "immediately after the transfer an interest or control in such property of 50 percentum or more remained in the same persons or any of them." As we have noted, there was no interlocking ownership between Gordon and Muskegon Michigan prior to the transfer. And petitioner, taking each transferor company separately, points out that after the transfer Gordon stockholders owned but 18⁶⁷/₁₀₀% of the authorized common stock of petitioner, and the Muskegon Michigan stockholders but 40%.

■ We confine our attention to the question whether the transferor stockholders had a 50 percentum *control* of the property of the petitioner immediately after the transfer. In the first place we seriously doubt, as petitioner urges, that the two sets of stockholders of the transferring corporations, must be separately considered in answering the question whether this 50 percentum of control existed. The statute enacts that the "control" must have *"remained* in the same persons or any of them." (Italics ours.) The use of the word "remained" connotes a continuity of control both before and after the transfer. And if such control continued, it obviously must have continued or "remained" in those persons who had had it before, namely, Gordon

and Muskegon Michigan stockholders. In other words, control "remained" in the stockholders of the transferee corporation if they had been owners of common stock in one of the transferor corporations, irrespective of the fact that they may or may not have been stockholders in both. If transferor stockholders, which includes those of Gordon and Muskegon Michigan, collectively owned 50 percentum of the common stock of the new corporation, we think the statute is satisfied. Fairbanks Court W. Groc. Co. v. Comm'r., 7 Cir., 84 F.2d 18. But the statute does not enact that 50 percentum control must remain in the "same persons," that is, in all of them; its terms are met if that quantum of control remains in "any of them." It matters not that all of the stockholders of the old corporations did not become common stockholders of petitioner. If "any" who were stockholders in Gordon plus "any" who were stockholders in Muskegon Michigan immediately after the transfer collectively control 50 percentum of petitioner, the statute is met. This is clearly so on the facts since former stockholders of Gordon own 18⅔% of petitioner's common stock, and former stockholders of Muskegon Michigan own 40% of petitioner's stock, aggregating more than 50 percentum thereof.

But petitioner urges that even if the statute be satisfied as to common stock ownership that is not sufficient. The argument is that any stockholder, common or otherwise, because of his power to veto various arrangements in a sense has "control" over the property of the corporation; and that therefore the "control" called for in the statute must be a 50 percentum control of all stock, Class A as well as common. Petitioner cites Sec. 112(j) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev. Acts, page 514, in support of its position, wherein it is enacted, "the term 'control' means the ownership of at least 80 percentum of the voting stock and at least 80 percentum of the total number of shares of all other classes of stock of the corporation." The answer to this proposition is that Sec. 112(j) expressly limits its coverage to Sec. 112. See Bickford's, Inc., v. Helvering, 2 Cir., 98 F.2d 568, wherein the same contention was raised and rejected.

Finally, the taxpayer urges that the real transferors were the stockholders and not the corporations; and that therefore the transferors' cost basis should be increased by the amount of gain recognized to them. The answer to this is implicit in all that we have just said. It is sufficient to say in amplification that the facts do not support such a view of this transaction. It is quite evident that no event has occurred which placed the stockholders, as against the transferor corporations, in control of these assets. So far as the record reveals, no stockholders' committees were active. The transaction seems to us to be what it purports to be, namely, a reorganization through intercorporate action. Compare Bondholders Committee v. Comm'r., 315 U. S. 189, 62 S.Ct. 537, 86 L.Ed. 784.

The decision of the Board of Tax Appeals is affirmed.