## ADAMSTON FLAT GLASS CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5570.

Circuit Court of Appeals, Fourth Circuit.

June 5, 1947.

William M. Drennen, of Charleston, W. Va. (Charles W. Moxley and Jackson, Kelly, Morrison & Moxley, all of Charleston, W. Va., on the brief), for petitioner.

L. W. Post, Sp. Asst. to Atty. Gen., (Sewall Key, Acting Asst. Atty. Gen., and Helen R. Carloss, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Review is sought of an order of the Tax Court of the United States determining deficiencies in income taxes against the Adamston Flat Glass Company in the aggregate sum of $2552.80 for the calendar years 1940, 1941 and 1942. The asserted deficiencies were founded upon the taxpayer's use of the same basis for depreciation of certain assets acquired by it in 1926 as had been applied to the properties in the hands of the former owner. Taxpayer's contention is that the properties were acquired in connection with a statutory reorganization and that it is, therefore, entitled to use the basis for depreciation of the former owner, while the Commissioner contends that the taxpayer must use the cost of the properties to it as the basis. The legal issues involved require an interpretation of Section 203(h) (1) (A) of the Revenue Act of 1926, and Section 113(a) (7) (A) of the Internal Revenue Code and a determination of the questions (1) whether there was in fact a "reorganization" whereby there was an acquisition by the taxpayer of "substantially all of the properties of another corporation," and (2) whether "immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them * * *." Statutory provisions presently helpful are in the margin.[1]

Adamston Flat Glass Company, the taxpayer, was incorporated June 18, 1926, to

---

[1] Revenue Act of 1926, c. 27, 44 Stat. 12, 26 U.S.C.A., Internal Revenue Acts, pages 150, 151:

"Sec. 203.

"(h) As used in this section and sections 201 and 204—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation) * * *."

26 U.S.C.A., Internal Revenue Code, § 113:

"Sec. 113. Adjusted basis for determining gain or loss—

"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—

* * * * * * *

"(7) Transfers to corporation. If the property was acquired—

"(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them.

* * * * * * *

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

* * * * * * *

"(b) Adjusted basis. The adjusted basis for determining the gain or loss

take over the properties of the Clarksburg Glass Company, hereinafter referred to as Clarksburg. The history of Clarksburg which led up to the circumstances now under consideration is shown in the following recital. Clarksburg was organized in 1913. Prior to the year 1924, while experimenting with a new process for manufacturing glass, it encountered financial difficulties and as a consequence, on August 27, 1924, through its president, W. M. B. Sine, it entered into an agreement with the Pittsburgh Plate Glass Company, hereinafter sometimes called Pittsburgh, whereby the latter company advanced to Clarksburg the sum of $70,000 to be used to pay current notes and accounts, and agreed to advance at its discretion additional sums from time to time not to exceed $100,000 in the aggregate. By this agreement, and in consideration of the financial and operating assistance rendered, Pittsburgh became actively interested in the operation of Clarksburg and received an option, never exercised, to purchase the Clarksburg properties if the then pending experiment proved successful. In September, 1924, pursuant to the agreement, Pittsburgh advanced the further sum of $100,000 secured by a second mortgage on the Clarksburg properties, which indebtedness, as of January 1, 1926, was evidenced by three notes all dated June 30, 1925, two in the amounts of $20,000 and $30,000 respectively, due on or before January 1, 1926, and one in the amount of $50,000 due on or before July 1, 1926. Of this indebtedness $70,000 was endorsed by Sine personally.

Early in 1925, for reasons of urgent financial expediency, the stockholders of Clarksburg and the stockholders of American Sheet Glass Company, another glass company operating in Clarksburg, undertook to effect a merger; and on February 9, 1925, the Clarksburg Flat Glass Company (hereinafter referred to as Flat Glass) was organized under the laws of West Virginia to take over the properties of the two com-

panies. Shortly thereafter, Flat Glass entered into agreements with Clarksburg and the American Sheet Glass Company whereby Flat Glass obtained an option, to be exercised within six months, to acquire the respective properties in exchange for shares of its stock and the assumption of all liabilities by Flat Glass. By July 7, 1925, Flat Glass had realized approximately $200,000 from the sale of its stock which was expended in payment of obligations of the Clarksburg and American Companies. It had received notes of Clarksburg totaling $171,800. The initial Pittsburgh loan of $70,000, made under the agreement of August 27, 1924, was repaid out of this money advanced by Flat Glass to Clarksburg. Continued financial difficulties prevented consummation of the projected merger; but efforts to bring it about were continued under the direction of W. M. B. Sine and H. B. Curtin and their associates, who were large stockholders in one or more of the three companies. Sine was the president and largest stockholder of Clarksburg, and was also a large stockholder of Flat Glass and American. He was also a direct unsecured creditor of Clarksburg for a small amount. Curtin was president and the largest stockholder of Flat Glass and the holder of a past due first mortgage note of Clarksburg in the amount of $18,500.

On January 1, 1926, Clarksburg defaulted in payment of its notes due to Pittsburgh on or before that date, whereupon by virtue of an acceleration clause, the note payable on or before July 1, 1926, also became due. On January 20, 1926, Pittsburgh instituted a suit in the District Court of the United States for the Northern District of West Virginia for the appointment of a receiver to foreclose its deed of trust. The foreclosure proceedings sought a sale of the properties subject to a first mortgage, executed by Clarksburg to W. M. B. Sine, Trustee, to secure notes in the sum of $150,000. A receiver, recommended by Sine,

from the sale or other disposition of property, whenever acquired, shall be the basis, determined under subsection (a), adjusted as hereinafter provided. * * *"

26 U.S.C.A., Internal Revenue Code, § 114:

"Sec. 114. Basis for depreciation and depletion.

"(a) Basis for depreciation. The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. * * *"

was appointed, and under his direction Sine operated the properties from January 22 to May 22, 1926. On April 16 judgment was entered in the equity suit in favor of Pittsburgh, providing that in default of payment within five days, the Clarksburg properties be disposed of by special commissioners at public sale in satisfaction of Pittsburgh indebtedness and subject to the prior lien of the first mortgage. The sale took place on May 20, at which time Pittsburgh bid in the properties for the amount of its indebtedness.

Certain transactions in connection with the foreclosure of the second mortgage throw light on the taxpayer's position, which the Tax Court failed to sustain, that the purchase by Pittsburgh of the mortgaged property hereinbefore mentioned was merely a step in the plan of reorganization which the interested parties were endeavoring to put through. Prior to the suit, Pittsburgh expressed its willingness to accede to any plan that would permit Sine and his associates to retain the properties, provided Pittsburgh's debt was paid; but the attempt to raise the necessary funds failed and foreclosure followed.

In February, 1926, the annual meeting of Clarksburg was held and a committee was appointed to arrange a general meeting of the stockholders of Clarksburg, Flat Glass and American to determine what should be done to protect their interests. In April, the committee recommended to a meeting of the stockholders of Clarksburg and Flat Glass that they form a new corporation and supply it with sufficient funds to enable it to buy the property at the sale. The name of Adamston Flat Glass Company was adopted, and Sine and J. A. McNicol were appointed trustees for the underwriters of the capital stock of the new corporation in order to obtain subscriptions to its stock. By May 17 sufficient funds had been subscribed, and on that date Pittsburgh wrote to its attorneys that it did not want the property but desired only to protect its interests and that Sine had perfected arrangements to enable him and his associates ultimately to acquire the property, and that if they should buy the property at the sale, Pittsburgh expected them to pay the notes with interest, and also the charges

and costs of the sale and of the receivership; that one-third of the $100,000 with interest and the fixed charges would be paid in cash, and the remaining two-thirds of the $100,000 would be paid in two equal installments in one and two years following the sale. It was found by the Tax Court that this letter was the substance of the agreement between Pittsburgh, on one side, and Sine on the other. In this letter Pittsburgh asked its attorneys as to whether the end in view could be better effected by Pittsburgh or by Sine bidding in the property. According to the uncontradicted testimony of Sine, it was finally decided that Pittsburgh should buy the property and transfer it to the new corporation and that the associates would make Pittsburgh whole so that it would lose nothing.

The day before the foreclosure sale to Pittsburgh, which took place on May 20, 1926, Sine deposited $33,500 with Pittsburgh's attorneys to show good faith. Pittsburgh bid in the property at the sale for $100,000 and the sale was confirmed on May 22, 1926. Pittsburgh received a deed of May 26, 1926, which recited that the consideration for the purchase was the sum of $100,000 of which amount $33,500 was paid in cash on the day of sale, and the residue, evidenced by a note in the sum of $66,500 and bearing interest at 6 per cent. per annum, was to be paid on or before December 31, 1926. Immediately after the sale Sine took control of the plant and operated it for himself and his associates. Subsequently by letter of June 3, 1926, from Pittsburgh to Sine, and by his response under date of June 15, it was agreed that Pittsburgh would sell all the plant and property of Clarksburg to Sine for the amount of its claim against Clarksburg and in addition an amount sufficient to reimburse Pittsburgh for all payments, costs, expenses and out-of-pocket amounts arising from the foreclosure proceedings, to be paid as follows: $33,500, the amount of the cash payment made by Pittsburgh to the commissioners on the day of sale, with interest, plus the principal of $100,000 and interest on the notes due to Pittsburgh by Clarksburg, plus all of the costs of the suit, sale and receivership and counsel fees incurred therein, and any deficit in the receiver's account. It was.

stipulated that the offer must be accepted and the sum of $80,000 paid within 30 days, and that within 30 days thereafter, an additional cash payment be made to reduce the total of the indebtedness to $66,666.66 for which Clarksburg was to give its notes, with interest at 6 per cent. secured by mortgage on the property. Acceptance of this agreement was made by Sine on behalf of the prospective new company. The new corporation was chartered on June 18, 1926, and became the taxpayer in this case. On June 29, 1926, a settlement was effected between it and Pittsburgh, under the terms of which Pittsburgh received the sum of $153,969.85, which consisted of the sum of $87,303.19 in cash and two notes of $33,-333.33 each, payable in one and two years respectively. A deed conveying the property to the taxpayer was executed.

 Upon these facts the Tax Court reached a conclusion which, if sound, was a sufficient basis for the dismissal of the taxpayer's petition. The court held that the taxpayer did not in fact acquire all the property of Clarksburg within the meaning of Section 203(h) (1) (A) because it bought the property from Pittsburgh which had become the independent owner thereof as purchaser at the foreclosure sale, and hence the continuity of a proprietary interest between Clarksburg, the original owner, and the taxpayer, required in a reorganization under the statute, was broken.[2] The reasons given for this conclusion are stated in the court's opinion as follows: "* * * For we note, first, that Pittsburgh had in mind also that if it had to buy the plant at receiver's sale, it would 'either operate the same or dispose of it, as circumstances seem to indicate'; second, that in its offer to sell on June 3, 1926, Pittsburgh set a deadline of 30 days after which its offer would be 'null and void'—not at all the act of a company obligated to be a mere transitory step in a merger, but indicative of its free and independent status as a vendor negotiating, on its own terms,

a sale; and third, the record indicates that the petitioner settled with Pittsburgh for less than the amount of its claim and expenses—again showing Pittsburgh not in the position of one contracting, as a part of the original plan, to take its debt and pass the property along."

We do not think that this conclusion can be sustained, notwithstanding the finality which must be accorded to the Tax Court's findings of fact. It is based in part upon a misunderstanding of the court's own findings of fact and in part upon reasons which do not sustain it. The statement contained in the court's first reason, that Pittsburgh intended either to operate the plant or dispose of it, is taken from preliminary correspondence between Pittsburgh and its lawyers and was not part of the agreement between Pittsburgh and the Clarksburg interests which contemplated that Clarksburg was to acquire and operate the property. Nor is it a fact, as stated in the court's first reason, that the taxpayer settled with Pittsburgh for less than the amount of its claim and expenses. The facts, found by the court, show that Pittsburgh suffered no loss. Moreover, it was immaterial that Pittsburgh set a time limit of 30 days within which the agreement for the transfer of the property should be effectuated. None of the circumstances indicate that there was a real break in the continuity of the transfer but, on the contrary, that the arrangement through which Pittsburgh was to acquire the property and then transfer it to Clarksburg was merely one step in an integrated transaction of the sort which has met with the approval of the Supreme Court. See Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; Bondholders Committee v. Commissioner, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784. One has only to read the Tax Court's findings to realize that Pittsburgh and Clarksburg were working in complete harmony throughout to effectuate a plan whereby Pittsburgh would

[2] See Pinellas Ice & Cold Storage Co. v. Commissioner. 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355; Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; Morgan Mfg. Co. v. Commissioner, 4 Cir., 124 F.2d 602; C. M. Mead Coal Co. v. Commissioner, 4 Cir., 72 F.2d 22.

be made whole for its advances and a new corporation would recover the Clarksburg property free of all debts except the first mortgage.

Nevertheless, the Tax Court's decision must be sustained because the transfer to the taxpayer in connection with the reorganization did not meet the requirements of Section 113(a) (7) (A) of the Internal Revenue Code that "immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them." The case was originally presented to us upon the assumption that stockholders who held a little less than one-half of the outstanding stock of Clarksburg before the transfer acquired or held a little less than one-half of the stock of Adamston immediately after the transfer; and hence it was conceded that these holdings did not meet the conditions of the statute. The taxpayer seeks to make good the deficiency by the contention in the first place that when both shareholders and creditors of an insolvent corporation continue their investment by taking part in a statutory reorganization and acquiring a proprietary interest in a new corporation, both shareholders and creditors should be taken into account in determining whether a 50 per cent. interest has been preserved. In the second place the taxpayer contends that even if the stockholders of Clarksburg must be excluded from the count, there remained creditors of Clarksburg who had a sufficient stake in its properties and acquired more than a 50 per cent. interest in Adamston so as to meet the statutory requirements. Authority for the theory that creditors may have a sufficient interest or control in property transferred in connection with a reorganization to satisfy the terms of the statute is found in Helvering v. Alabama Asphaltic Limestone Company, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, in which it was held that the continuity of interest test in a statutory reorganization was satisfied when a creditors' committee was formed which instituted involuntary bankruptcy proceedings to enforce their demands and acquired stock of a new corporation to which the assets purchased by the creditors' committee at the bankruptcy sale were transferred. In

effect the court said 315 U.S. at page 183, 62 S.Ct. at page 543, 86 L.Ed. 775 that for practical purposes the creditors became proprietors when they "took steps to enforce their demands against their insolvent debtor."

The taxpayer contends that the facts of the pending case indicate that the creditors of Clarksburg had an "equity" interest in its properties which survived the transitional stage. The total indebtedness of Clarksburg on January 22, 1926, when foreclosure proceedings were instituted, was $592,-405.13, and on May 22, 1926, when the sale to Pittsburgh was confirmed, the indebtedness was $655,703.43, including on both dates the first and second mortgage debts in the aggregate sum of $250,000. The mortgage creditors acquired no stock in Adamston with the exception of H. B. Curtin, the president and a large stockholder of Flat Glass, who held one of the first mortgage notes in the sum of $18,500. Curtin was also an unsecured creditor in the sum of $3,580.-75. Sine, who was president and a large stockholder of Clarksburg, was an unsecured creditor in the sum of $532.26. These two men acquired 807 out of 1500 shares of Adamston outstanding. Unsecured creditors, including Sine and Curtin, who held aggregate claims in the sum of $4,384.39, acquired 814 shares of Adamston. Flat Glass, the largest unsecured creditor of Clarksburg, held notes which, with interest, amounted to the sum of $179,810.87. Flat Glass acquired no stock in Adamston but minority stockholders of Flat Glass acquired 1,067 shares of Adamston.

These computations show that creditors of Clarksburg owned more than a majority of stock of Adamston after the transfer; but that these creditors owned only a small part of the indebtedness of Clarksburg— less than half thereof even if the debt to Flat Glass be included—before the reorganization took place. A like situation existed as to the stockholders. Figures which have been brought to our attention since the argument in this court show that Clarksburg had outstanding 18,215 shares of voting stock and 3,061 non-voting shares of which twelve shareholders owned 8,605 voting and 739 non-voting shares. These twelve stockholders acquired 754 of the

1,500 shares of Adamston. It thus appears that shareholders who owned approximately 44 per cent. of all the shares and approximately 47 per cent. of the voting shares of Clarksburg before the transfer owned a little over 50 per cent. of the shares of Adamston after the transfer.[3]

 Since neither the creditors nor the shareholders separately considered held a 50 per cent. interest before the transfer, an essential requirement, as we shall show, the taxpayer is relegated to the contention that the two classes may be combined for the purposes of the statute. This contention is novel, so far as we are advised, and it is difficult to imagine a situation under which it would be tenable. It is not explained how the control of the properties could be shared by both stockholders and creditors, or how the relative weight to be given the two classes of interest could be ascertained in order to determine whether the continuity of the required percentage had been maintained. The interests of stockholders and the interests of creditors are ordinarily in opposition to each other insofar as control of the corporate body is concerned. Shareholders of a corporation possess a proprietary interest in the corporate property, speaking in a broad rather than a technical sense, and control the corporate activities until the creditors assert their rights and take effective command, as in the case of a bankruptcy proceeding against an insolvent debtor; and when the debtor is insolvent in the bankruptcy sense, the rights of shareholders are eliminated and they may be entirely excluded from a corporate reorganization. See Helvering v. Alabama Asphaltic Limestone Company, supra; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110.

We confine ourselves, however, to the situation in the pending case. The Tax Court made no finding as to insolvency of Clarksburg but assumed its existence; and we may fairly do the same, for although the book value of the assets exceeded the debts by a substantial amount when the receiver took charge and when the foreclosure sale took place, the physical assets sold for less than enough to pay the second mortgage debt and the expenses of foreclosure, and the accounts receivable were less than the accounts payable. Notwithstanding the unsatisfactory financial state of the corporation, only the second mortgage creditors asserted their right to control the properties before the transfer. These creditors were paid off; the holders of the first mortgage took no action but were content with the preservation of their lien; and the unsecured creditors took no steps to take command of the disposition of the property.

All of the transactions which led up to the sale of the properties and the reorganization were conducted by the officers and stockholders of the corporations involved for the benefit of their shareholders. The loans by Pittsburgh to Clarksburg in 1924 were arranged by the President of Clarksburg. The ineffectual attempts at reorganization in 1925, when Flat Glass was formed, were made by shareholders of Clarksburg and American, and the formation of the taxpayer in 1926 was carried out as the result of the annual meeting of stockholders of Clarksburg in that year and subsequent joint meetings of the stockholders of Clarksburg, American and Flat Glass Companies. It cannot be said that the creditors of Clarksburg stepped into the shoes of the old stockholders in such a way as to give them the interest or control of the corporate property contemplated by the statute. It is doubtless true that the creditors, as well as the stockholders, of Clarksburg were associated in the activities which led up to the reorganization since to some extent the stockholders and the creditors were the same persons. And since both creditors and stockholders became stockholders in the new enterprise, it may be said in a broad sense that some continuity of in-

---

[3] These figures do not correspond precisely with the Tax Court's findings which showed that the stockholders of Clarksburg who remained acquired less than 50 per cent. of the stock of Adamston; but the figures are based upon lists of stockholders contained in exhibits stipulated by the parties. In view of the final conclusion we have reached, we accept the corrected figures without further reference of the case to the Tax Court.

terest by both classes survived the transfer. But we are dealing with a statute which confers a privilege upon taxpayers under certain conditions, and unless these are complied with, the basis for the computation of gains and of depreciation must be the same as that imposed upon taxpayers generally. Hence we hold that the claims of the creditors may not be taken into account in deciding the present issue.

We confine our attention to the interests of the Clarksburg stockholders, and must still determine whether the statute requires that the stockholders who hold a 50 per cent. or greater interest or control after the transfer must have had at least a 50 per cent. interest or control before that event. In our opinion this question must be answered in the affirmative, for otherwise that continuity of interest which the statute was designed to meet would not prevail. The provision of the statute, that in case of a corporate reorganization the gain upon a sale and the depreciation from wear and tear of the property shall be estimated upon the same basis as if the property were in the hands of the transferor, was intended to take into account the actual situation and to postpone the recognition of gain or loss until it had in fact been realized. Reorganizations " * * * are deemed by Congress to be transitional, continuing transactions which are not sufficiently 'closed' to justify *economically* (though there may be a different answer on a strict *legal* basis) the imposition of capital gains tax at the immediate moment of an 'ordinary business' transaction." Paul, Studies in Federal Taxation (3d Ser.1940) 4, 5. This thought is revealed in the phrase "an interest or control of 50 per cent. or more *remained* in the same persons."

If this underlying purpose of the statute is kept in mind, it will be seen that the continuance of the 50 per cent. interest in both the original owner and in the transferee is essential and that the words "or any of them" in the concluding portion of the section were used to give elasticity to the provision and make it unnecessary for persons holding or controlling a majority interest in the original owner to control precisely the same proportionate interests in the transferee. This is the view taken in a General Counsels' opinion in reference to the 80 per cent. requirement in the Revenue Act of 1926. G.C.M. 7472, IX-1, Cum.Bull, 184,191-2 (1930). See also Mertens, Law of Federal Income Taxation (1942) §§ 21.-97, 21.98.

The opposing argument is grounded largely on the concluding words of the requirement that a 50 per cent. interest or control in the property shall remain in the same persons or *any of them;* and it is contended that this requisite is satisfied if a majority interest is held by *any* of the stockholders of the tranferor after the transfer. This contention, if given full force, would lead to the unreasonable conclusion that the ownership of a 50 per cent. interest after the transfer by one who held as little as 1 per cent. of the stock before the transfer would be sufficient. The taxpayer in the pending case, it is true, would not urge so extreme a position, but would be content with a ruling that the stockholders of the transferee should have previously held a substantial interest in the transferor. It has been held under a variety of circumstances that the retention of a substantial rather than a controlling interest in the tranferee corporation satisfies the requirement of a statutory reorganization. Miller v. Commissioner, 6 Cir., 84 F.2d 415; John A. Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281; Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; Helvering v. Watts, 296 U.S. 387, 56 S.Ct. 275, 80 L.Ed. 289.[4]

But in these cases there was involved no statutory requirement for the retention of an interest of any specified amount in the transferee, such as that now under consideration. In Muskegon Motor Specialties Co. v. Commissioner, 6 Cir., 134 F.2d 904, however, such a statute was thought to be satisfied although a majority interest in one of two transferring corporations was

---

[4] It is pointed out in Paul, Studies in Federal Taxation (3d Ser. 1940) 103-4 that in the Watts case the transferor retained 45.34 per cent. interest, in the Nelson case 38.46 per cent., and in the Minnesota Tea case 55.85 per cent.

seemingly not preserved in the transferee. In C. I. R. v. Bankers Farm Mortgage Co., 7 Cir., 145 F.2d 772, upon which the taxpayer also relies, the court used the following language in construing the phrase "or any of them" in the section now under examination, 145 F.2d at page 774:

" * * * We construe the modifying phrase to mean that if A and B held 90% at the beginning of the reorganization and A held 60% after the reorganization was effected, there would be a statutory continuity of interest. No other good reason for the existence of the modifying phrase 'or any of them' has been suggested or occurs to us. It cannot be ignored in applying this statutory test to the facts in the instant case."

It does not appear, however, that the court intended to rule that the parties who retain a 50 per cent. interest need not have had so large an interest before the transfer, because in that case the creditors, through whose efforts the reorganization was accomplished, seem to have had more than a 50 per cent. interest at both points of time. Moreover, the court did not overrule or even mention earlier decisions in which under similar statutory provisions the need for the existence of the specified interest both before and after the reorganization process is plainly indicated. Thus in Monarch Electric & Wire Co. v. Commissioner, 7 Cir., 38 F.2d 417, 418, 419, it was said:

" * * * In our judgment the working of the statute is not ambiguous in this particular. It explicitly says that 'if an interest or control of 50 per centum or *more* remains in the same persons, or *any of them*,' (italics ours), then the statute applies. Before the reincorporation Deutsch, it is true, owned and controlled more than 50 per cent. of the stock; but it is also true

that he, with either one or more of the Schwabs, at that time owned and controlled more than 50 per cent. of the stock. After the reincorporation we find the persons holding the stock in the new corporation are identical with the stockholders in the old, and that Deutsch, with either one or more of the Schwabs, still owns and controls more than 50 per cent. of the stock of the new corporation; and this brings the transaction squarely within the statute."

* * * * * *

"To my mind the evident intent of the section is, that if, after any such change, any person or persons, singly or collectively, shall hold in the reorganized business as much as 50 per cent. of the entire interest or control therein, and are the same person or persons who, singly or collectively, held as much as 50 per cent. interest or control in the old business, the reorganized business shall not, for the purpose of determining invested capital, be allowed a greater value on any of its assets than would have been allowed, upon the same assets, to the old business had there been no reorganization.

"Here not only 50 per cent., but the entire ownership—and so the entire control or interest in the consolidated business—is in the same persons, and in none others, as was the entire interest and control in the old business."

The holding of this case was expressly reaffirmed by the Seventh Circuit in Fairbanks Court Wholesale Grocery Co. v. C. I. R., 84 F.2d 18. To the same effect is the decision in Rex Mfg. Co. v. Commissioner, 7 Cir., 102 F.2d 325; see also Republic Steel Corp. v. United States, 94 Ct.Cl. 476, 40 F.Supp. 1017.

The decision of the Tax Court is therefore affirmed.