OPINION. TukneR, Judge: Briefly stated, the issue is as to the amount to be included in equity invested capital, under section 718 (a) (2) of the Internal Bevenue Code,[1] for the property paid in for stock in the 1926 recapitalization. It is there provided that property paid in for stock, as paid-in surplus, or as a contribution to capital, shall be included in equity invested capital “in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange.” The parties are in accord to the effect that the unadjusted basis for the property paid in is to be determined under the provisions of section 113 (a) (7) of the Code,[2] and is the cost of the property to the petitioner, unless the property was acquired by it “in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them,” in which case the basis for the property is the same as it was in the hands of the transferors. They are also in accord that the 1926 recapitalization was a reorganization within the meaning of the statute, wherein a reorganization is defined to mean “a recapitalization.” In its return the petitioner, in reporting equity invested capital, included $2,800,000 “as representing the cash, old stock and land.” The patents, applications for patents, and rights therein were included in an item of $1,000,000 “as representing tlie intangibles and good will.” The respondent did not disturb the item of $2,800,000, but disallowed or eliminated the $1,000,000 item in its entirety. Abandoning the method by which it determined and reported equity invested capital in making its return, the petitioner now claims that the 40,000 shares of Class A stock and the 80,000 shares of Class B stock issued to the Brauns, National Chemical, Beeps, and Davis, or their nominees, were in their entirety issued for property paid in as of the date of issue; that the fair market value of those shares at the date of issue was $30 per share, or a total of $2,100,000; that such fair market value represented the cost of the property paid in for the stock so issued; that on the facts and under section 113 (a), such cost is the unadjusted basis of the property paid in, the amount of which is includible therefor in equity invested capital, under section 718 (a) (2) ; and that the $2,100,000, plus the $1,400,000 in cash paid in for stock by Ford, Bacon & Davis, Inc., and its associates, or $3,500,000, instead of the $3,800,000 claimed on its return, represents the amount includible in equity invested capital as capital and property paid in for stock. There is, of course, no question here as to the inclusion in equity invested capital of the $1,400,000 in cash paid in for stock by Ford, Bacon & Davis, Inc., and its associates.[3] The short answer to the petitioner’s present claim is that the only property paid in in the 1926 recapitalization as capital or added capital which had any basis to it, under section 113 (a) (7), supra, or any other section of the Code, was the real estate and the patents, applications for patents .and rights comparable in character. While the old shares did constitute property in the hands of the Brauns and National Chemical, by whom they were paid in, so to speak, for new shares, the petitioner in so far as the old shares were concerned had no newly received or acquired property whatever in its assets after the exchange. The old shares ceased to exist and the only change was that after their surrender and the new shares were issued, the petitioner’s capital stock liability was represented by the 40,000 shares of Class A stock and the 30,000 shares of Class B stock, rather than the old shares of common and preferred stock. In short, after the exchange the petitioner in so far as the old shares were concerned had added to its assets zero property and there could not therefore be any amount to represent the unadjusted basis of zero property, as would have to have been the case if any additions were to be made to equity invested capital, under section 718 (a) (2), supra. See and comisare Crean Brothers, Inc., 15 T. C. 889. Approaching the problem from another angle, it is evident that but for the land, patents, applications for patents and rights, the property of the petitioner having a basis for gain or loss was exactly the same after the recapitalization as it was before. Such being the case, there is no way, so far as we can see, and the petitioner has not undertaken to demonstrate a way, by which such a claim of some amount to represent a basis for the old stock paid in could rest upon anything other than the property and assets which it already had. That such a theory is without merit is at once apparent. The petitioner was not a new or different corporation, and we know of no provision of the Code nor any plausible theory, in the case of the recapitalization of a corporation, which would in any way require an adjustment or change in the basis to the petitioner of properties which it already owned at the time of such recapitalization. Most obvious, however, is the fact that the assets already owned were not paid in for the new shares issued in the recapitalization. As to the real estate formerly belonging to S. J. Braun, we have no problem. So far as appears, that real estate was included in the equity invested capital item of $2,800,000 reported by the petitioner “as representing the cash, old stock and land,” and as to that item the respondent in his determination of deficiency made no change. Accordingly, our problem is narrowed to that of determining the amount equal to the petitioner’s unadjusted basis for determining loss upon sale or exchange of the patents, applications for patents and rights. As stated above, the parties are agreed that the unadjusted basis is to be determined under section 113 (a) (7), supra, and was their cost to petitioner, unless it be found that immediately after their transfer to the petitioner “an interest or control in such property of 50 per centum or more remained in the same persons or any of them,” in which case, their unadjusted basis was the same as it was in the hands of the transferors. The facts being as they are, it is our conclusion that an interest or control in such property of 50 per centum did remain in the same persons or any of them. Except as to voting rights, the Class A shares and Class B shares were in all respects equal and the beneficial ownership of the corporation and its properties after the issue of the new stock was actually the same for a share of Class B stock as it was for a share of Class A stock. Lumping the two classes of stock together, the beneficial interest immediately after the transfer of the property and the payment of the $1,400,000 was 50 per centum in Ford, Bacon & Davis, Inc., and its associates, and 50 per centum in the Brauns, National Chemical Company, Beeps, and Davis. The petitioner would have us say, however, that as to the patent rights of Keeps and Davis the transactions in which they participated looking to the transfer thereof to the petitioner were separate and apart from the reorganization, to the end that though the said patents and patent rights were acquired by the petitioner “in connection with” the reorganization, it be held that the Brauns, and not Keeps and Davis, were the trans-ferors. As to the acquisition of the 1,250 shares of Class B stock by Keeps and Davis, the petitioner, on the other hand, takes exactly the contrary position and argues that those transactions were part and parcel of the reorganization, to the end that the Brauns and National Chemical at no time immediately or at any other time after the transfer could be said to have had an interest of 50 per centum in the property transferred since the 1,250 shares acquired by Keeps and Davis would have to be included to make up the interest of 50 per centum. The facts show that the transactions whereby the patents, applications for patents and rights were transferred to the petitioner, were a part of and were essential and prerequisite to the effecting of the reorganization. Even though in some respects they have the appearance of being separate transactions, the facts show that they were in truth interrelated and not susceptible of being broken down into separate and distinct transactions. They were three-way transactions with considerations flowing to and from all of the parties, to the end that the petitioner, as a part of the consideration for the issuance of the 40,000 shares of Class A stock and the 30,000 shares of Class B stock should receive any and all rights and interest which Reeps, Davis and the Brauns had in the patents and applications for patents; that Reeps and Davis were to receive the stock set over and contracted for and the other accompanying considerations; and that the Brauns and National Chemical should have all of the 40,000 shares of Class A stock and the remaining 28,850 shares of Class B stock. The fact that some side considerations might have passed between Reeps, Davis, and the Brauns is not, in our opinion, of any moment for the purposes here. The fact is that before the transactions in question, which were part and parcel of the reorganization, the Brauns, Beeps, and Davis had and owned rights and interests in the patents and applications for patents, and after the transactions, the patents, applications for patents and all rights therein belonged to the petitioner, while the Brauns, National Chemical, Reeps, and Davis had an interest of 50 per centum in them through the ownership of the 40,000 shares of Class A stock and the 30,000 shares of Class B stock which had been acquired by them. See and compare Independent Oil Co., 6 T. C. 195; Muskegon Motor Specialties Co., 45 B. T. A. 551, affd. 134 F. 2d 904; Bankers Farm Mortgage Co., 1 T. C. 406, affd. 145 F. 2d 772; Hazeltine Corporation, 32 B. T. A. 110, affd. 89 F. 2d 513. We do not understand that for the purposes here any significance is attached to the fact that other sales of Class B stock were made by the Brauns and National Chemical, pending completion of the reorganization, and that the Class B shares so sold were issued directly to the purchasers. In any event, however, those transactions were independent of and had no relation to the reorganization and did not deprive the Brauns, National Chemical, Beeps, and Davis of the 50 per centum interest immediately after the reorganization, as determined above. Samuel Insul, Jr., 32 B. T. A. 47; Evans Products Co., 29 B. T. A. 992. Having concluded that immediately after the transfers an interest of 50 per centum in the property remained in the same persons or any of them, it becomes unnecessary to determine the troublesome question here presented as to control, the determination of which question would require consideration of the effect of the differences between the voting lights of the Class A and the Class B shares of stock; the interposition, at or shortly after the reorganization, of the voting trust, wherein two of the voting trustees were named by the Brauns, two by Ford, Bacon & Davis, Inc., and its associates, and the fifth was-Hancock, attorney for the petitioner, who had, in some phases of the transactions by which the reorganization was effected, been named as representing the Brauns; also the effect, if any, of the fact that at the outset the petitioner’s board of directors was to be composed of nine members, five of whom were to be named by the Brauns and National Chemical, and four by Ford, Bacon & Davis, Inc., and its associates. Except for such conclusions as may be drawn from the facts showing the nature and character of the properties, the use to which they were put and the part they were playing in the petitioner’s business operations at the time of the 1926 recapitalization, there are no facts on which one might conjecture or speculate as to the basis of the trans-ferors for the transferred properties. Unless, therefore, the facts are such that some allowance must be made under the doctrine of Cohan v. Commissioner, 39 F. 2d 540, we must resolve the question of trans-ferors’ basis against petitioner for failure of proof. All of the so-called Beeps patents, except one, had been issued to Beeps, and presumably covered inventions by Beeps. The patent excepted was issued on November 26,1918, to Henry Bousset. Whether or not the patent covered an invention of Bousset, Beeps, or someone else, we do not know. At any rate, it had come into Beeps’ possession in some unknown manner and for an undisclosed consideration. The other patents involved had been issued to Beeps in 1923 and 1925. He also had some applications for patents pending. His original contract with the Brauns for the use of the patents was dated September 12, 1&25, and carried an agreement to pay royalties of $12.50 per cabinet or equivalent structure manufactured or sold by or for the Brauns — iil reality,- however, by the petitioner, which had assumed the Brauns’ contract. A minimum annual royalty of $1,250 was provided-The record contains no evidence, either directly or indirectly, as to'' Beeps’ basis for the said patents and patent applications. That they were of some value in the manufacture of laundry machinery and equipment, is, we think, apparent from the evidence. Except for the Rousset patent, the patents were issued to Keeps within two years or less prior to his licensing agreement to the Brauns. We think it reasonable to assume that- they did have some cost to him. As to the interest of the Brauns in the patents, those interests were, so far as appears, immediately set over and assigned to the petitioner, and there is no way of knowing that to the Brauns they had any cost or other basis other than the royalty obligation which had been assumed by the petitioner. Applying Cohan v. Commissioner, supra, and bearing heavily against the petitioner, whose burden it was to produce the proof of Keeps’ basis for the patents and patent applications, and of any interest therein owned by the Brauns, it is our conclusion, and we have so found, that their basis to the transferors was $2,000. As to Davis, we have even less evidence. So far as appears, any patents which had been issued covering creations by Davis or any creations covered by pending applications for patents, had been issued to and were pending in the name of the petitioner. It may be assumed, we think, that all of his work with respect to any patents or patent applications was done as an employee of the petitioner, for which he had been receiving a salary of $5,000 a year. Presumably, ithe petitioner bore all of the costs of his work. It is to be noted also that his contract or agreement covering his work was directly with the petitioner, and not with or through the Brauns. In that situation, we are unable to conclude on the evidence before us that the patents and patent applications of Davis had any cost or other basis to him. The Austin patents belonged to members of the Braun family. They had been acquired by purchase but the date of their purchase is not known, neither do we know what was paid for them. They had been used for a number of years by the petitioner under an unwritten royalty agreement equal to 3 per cent of all sales, and for a period of 4 years preceding the recapitalization, the average annual royalty payment was $27,661.75. That fact, plus the fact that the petitioner’s products were based fundamentally on these patents, gives some indication that they were of substantial value at the time of the recapitalization. It ■does not follow, however, that the amount of the royalties paid were necessarily an indication of the quantum of their value. The February 3 agreement between Ford, Bacon & Davis, Inc., and the Brauns shows that Ford, Bacon & Davis, Inc., thought that the royalty contract was as to the petitioner burdensome and disadvantageous. The elimination of that contract was one of the conditions made by Ford, Bacon & Davis, Inc., to its participation in the recapitalization. We do not know anything about the patents at the time they were acquired by the Brauns, and, as stated, there is no evidence whatever as to their purchase price. There is no showing that at the time of the purchase their importance or value had to any extent been established by their use. Presumably, they were acquired by the Brauns by outright purchase since in contrast with the agreement with Beeps there was no agreement by the Brauns to pay royalties over to anyone. On the basis of the facts which we do have, it is our conclusion that they must have had some cost to the Brauns. We are unable, however, to say that at the time of their purchase by the Brauns they could have commanded, or did command, a price which would even approach that which they might have commanded at a later date. So far as we know, they were at the time of purchase unproven and wholly untried. Applying the doctrine of Cohan v. Commissioner, supra, and bearing heavily on the petitioner, whose burden it was to produce the evidence, it is our conclusion, and we have so found, that the basis of the patents in the hands of the Brauns, the transferors, was $10,000. As for the trade name “Prosperity,” the evidence is not sufficient to indicate the substance or significance of the assignment of the trade name to the petitioner by National Chemical. Apparently the trade name “Prosperity” in so far as it related to laundry machinery had originated with National Chemical and had been used by the petitioner during all, or a portion, of its existence. The document executed by S. J. Braun, as president of National Chemical, on April 12, 1926, is to all appearances a quitclaim deed. Whatever the scope of the right or rights assigned by the document, there is nothing whatever in the record to indicate that to National Chemical they had any basis for determining loss to it upon their sale or exchange. Decision will be entered under Rule 50. SEC. 718. EQUITV INVESTED CAPITAL. (a) Definition. — The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)— ******* (2) Property paid in. — Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * * SEC. 113. ADJUSTED BASIS EOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. — The basis of property shall be the cost of such property ; except that— ******* (7) Transfers to Corporation. — If the property was acquired— (A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, * * * then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer. SEC. 718. equity INVESTED CAPITAL. (a) Definition. — -The equity invested capital for any day of any taxable year shall.be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)— (1) Money paid in. — Money previously paid in for stocft, or as paid-in surplus, or as a contribution to capital;