**TEXAS CITY TERMINAL RAILWAY COMPANY**

v.

**The UNITED STATES.**

No. 295–52.

United States Court of Claims.
June 5, 1957.

Charles B. McInnis, Washington, D. C., for plaintiff. G. Kibby Munson, Philip S. Jessup and Roberts & McInnis, Washington, D. C., were on the briefs.

Herbert S. Fessenden, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is a suit to recover income taxes alleged to have been erroneously assessed and collected from the plaintiff corporation for 1945 and 1946. The principal issue is whether the plaintiff, in computing depreciation and gain or loss upon the sale of certain assets acquired from a predecessor corporation, may, for income tax purposes, use as the basis of such assets (1) the basis they would have had in the hands of a predecessor corporation, or (2) the cost of such assets to the plaintiff taxpayer corporation. Should we hold that plaintiff is entitled to the basis of its predecessor corporation, then a second issue as to the correct evaluation of that basis is presented.

Plaintiff's predecessor corporation was the Texas City Transportation Company, hereinafter referred to as the Transportation Company. Prior to August 20, 1920, when Transportation Company ceased operations, it owned certain terminal and warehouse properties located on the shore of Galveston Bay in Texas City, Texas. These properties consisted of docks, piers, warehouses, a grain elevator, about thirty-four miles of belt line railroad tracks, switch engines, freight

228

cars, etc. Transportation Company operated the noncarrier type properties, and its wholly owned subsidiary, the Texas City Terminal Company, operated the the carrier type facilities under lease from the Transportation Company.

Transportation Company had issued and outstanding 25,000 shares of common stock of $100 par value, of which all but five shares, held as director's qualifying shares, were owned by the Texas Investment Company of Pittsburgh, Pennsylvania. Transportation Company also issued and had outstanding 3,000 shares of preferred stock of $100 par value which were owned by 21 different individuals in varying amounts.

On November 1, 1909, Transportation Company issued $2,000,000, six percent (serial) gold bonds which matured annually in various amounts beginning November 1, 1912. These bonds were secured by a first mortgage and deed of trust on all of Transportation Company's land and other property, and by a pledge of all of the capital stock in its subsidiary, the Texas City Terminal Company. The Central Trust Company of Illinois and James L. Houghteling, a member of the firm of Peabody, Houghteling & Co., underwriters and investment brokers, were trustees under the first mortgage and deed of trust. Subsequent to the issue of the first mortgage bonds, the Transportation Company issued $600,000 principal amount six percent gold notes (unsecured), dated August 1, 1912, with original maturity date of August 1, 1917, but extended for the entire issue to August 1, 1922. These notes were subordinate to the claims of the holders of all of Transportation Company's outstanding first mortgage bonds and interest thereon.

Transportation Company paid the annual maturities on the first mortgage bonds of $50,000 in each of the years ended November 1, 1912, 1913 and 1914. However, due to the decrease of its business, Transportation Company was unable to pay its first mortgage bonds maturing serially on November 1, 1915, 1916, 1917, 1918 and 1919, or the interest which became due thereon in those years. Neither was it able to pay the interest due on its gold (unsecured) notes.

The first mortgage bonds of $75,000 which matured November 1, 1915, and $75,000 which matured November 1, 1916, together with unpaid interest coupons thereon, were purchased by Peabody, Houghteling & Co., hereinafter referred to as Houghteling & Co. That partnership also purchased all interest coupons presented for redemption by the holders of other outstanding first mortgage bonds which became due semi-annually for the years ended November 1, 1915 to November 1, 1917, inclusive. Houghteling & Co. from time to time entered into agreements with the Transportation Company extending the time of payment on the bonds held by the partnership and the interest coupons which it had purchased. The time as finally extended for the payment of this indebtedness owed Houghteling & Co. by Transportation Company was December 10, 1919. Under the terms of the first mortgage and deed of trust, the agreement extending the time for payment of the principal and interest of the first mortgage bonds, without the prior consent of three-quarters of all the holders of the other outstanding first mortgage bonds, caused the lien and security of the first mortgage and deed of trust, so far as it applied to the bonds and interest so extended, to be postponed and subordinated to the lien and security of all other outstanding first mortgage bonds and unpaid interest coupons not then due and not so extended. The lien and security of the extended bonds and interest coupons remained at all times superior to the unsecured gold notes and other unfunded indebtedness of the Transportation Company.

The $150,000 face value first mortgage bonds and all interest coupons which had been purchased by Houghteling & Co., became due and unpaid on December 10, 1919, and were in default thereafter. Of the remaining outstanding bonds, $75,000 matured November 1, 1917,

$100,000 November 1, 1918, and a like amount on November 1, 1919. Also all interest coupons which became due semi-annually during 1918 and 1919 were unpaid and in default. These bonds and interest coupons were not extended so that the owners thereof retained equal rights with other outstanding first mortgage bondholders whose bonds and coupons had not yet matured.

Houghteling & Co. addressed a circular letter, dated April 20, 1919, to all of the holders of the first mortgage bonds in an attempt to reorganize the Transportation Company by providing for the issuance of new securities by either the Transportation Company or by a newly formed corporation. Under the plan proposed by Houghteling & Co., the holders of the unsubordinated (not extended) first mortgage bonds were to receive a new issue of first mortgage, six percent 20-year sinking fund income bonds which would be dated May 1, 1919, in a principal amount equal to the face value of the bonds then held plus unpaid interest coupons to date of issue of the new bonds. Interest coupons were to be attached to the new bonds for interest maturing May 1, 1921. All holders of subordinated first mortgage bonds and interest coupons, and all other junior creditors and stockholders were to deposit their securities with a trustee, subject to the condition that if the new first mortgage bonds did not receive full interest at six percent for the first two years, the first mortgage bondholders would become absolute owners of the property without foreclosure or any legal proceeding. This plan of reorganization was not successful and a second letter, dated January 10, 1920, was sent to the holders of the unsubordinated first mortgage bonds. This letter contained a copy of the first letter with a form of endorsement and reply for depositing their bonds with Houghteling & Co. The letter stated in part:

"A very large majority of the holders of the first mortgage bonds agreed to the plan and made deposit of their bonds, but we have not been able to declare the plan operative be-cause one stockholder of the Company, who had agreed to deposit his stock, has failed to do so.

"In view of these facts we cannot carry out the procedure originally proposed, but we can produce the same result by a foreclosure of the present first mortgage. This, however, means the incurring of considerable expense which we had hoped to avoid by our prior plan. * * * We are willing to relieve our clients of this burden, however, and we ourselves will agree to advance the necessary moneys upon your acceptance of the following conditions: * * *".

The letter went on to provide as one of the conditions that Houghteling & Co., for moneys advanced and services rendered and to be rendered, would receive all of the junior securities, including stock, that might be issued by the new corporation. This stock and junior securities were to be deposited with a trustee for the benefit of the holders of the new first mortgage bonds.

Approximately 93 percent of the first mortgaged bondholders of the Transportation Company agreed to the foreclosure plan and deposited their bonds with Houghteling & Co. As in the original proposal, the holders of the unsubordinate first mortgage bonds were to receive from the new corporation first mortgage bonds with the same face value as those turned in, plus interest as shown by the overdue interest coupons.

Pursuant to this plan, the Central Trust Company of Illinois and James L. Houghteling, Jr., as trustees under the first mortgage and deed of trust, instituted on March 16, 1920, foreclosure proceedings in the District Court of Galveston County, Texas. The court appointed a receiver to hold, possess and operate all of the properties of the Transportation Company. On June 11, 1920, the court gave judgment to the trustees for the payment of certain taxes made by them on behalf of the transportation Company, and to the holders of the unsubordinated first mortgage bonds for principal and interest in the total amount

of $1,875,524.19, and to the holders of the subordinated bonds, and interest coupons held by Houghteling & Co., for principal and interest in the total amount of $494,208.05. The court appointed a Special Master Commissioner who was ordered to sell the property July 6, 1920, at public auction to the highest bidder. In accordance with an amended petition filed by the trustees in the foreclosure proceedings asking for the above-mentioned judgment for the bondholders, the court required that the sale be of the entire properties of the Transportation Company as one parcel and as an entirety. The order of the court further provided that the purchaser could present a receipt from the trustees for the payment of the judgment given for the taxes paid by them and could present first mortgage bonds which had not been postponed or subordinated as a pro tanto credit on the purchase price. If the purchase price was more than sufficient to pay the judgments to the trustees and to the holders of the unsubordinated first mortgage bonds, then the subordinated bonds and interest coupons could be presented and credited on the purchase price in the same amount as they would be entitled to in cash. No bid was received for the property when it was put up for auction on July 6, 1920, and a new order was then issued to sell the property at auction on August 3, 1920. On this date the properties of the Transportation Company were sold to Augustus S. Peabody, the only bidder, for the bid price of $500,000. There was no objection raised by anyone and the sale was therefore confirmed by the court. The purchase by Peabody was made on behalf of the first mortgage unsubordinated bondholders who had agreed to the plan of reorganization, and on behalf of Houghteling & Co. This whole procedure was carried out in accordance with the provisions set forth in the Houghteling & Co. letter of January 10, 1920, to the bondholders (finding 13).

Having made full payment of the $500,000 bid price on September 18, 1920, the Receiver and Special Master Commissioner executed a deed conveying the property, including contracts and claims of the Transportation Company, to Peabody. In paying for the property, Peabody, in accordance with the court's order, had deposited with the Special Master Commissioner unsubordinated bonds with the face value of $1,566,000, plus interest coupons thereon. There remained outstanding only $55,500 face value unsubordinated bonds with unpaid interest coupons attached which represented only about 3.42 percent of the total face value unsubordinated bonds of the Transportation Company outstanding at the time of the foreclosure sale. The holders of these bonds were entitled to the pro rata share of the purchase price which amounted to $15,019.97. This amount was paid by the purchaser to the Special Master Commissioner, who in turn gave it to the trustees for distribution to the non-participating bondholders. By order of the court on December 17, 1920, the Receiver was discharged and the receivership closed. None of the junior creditors, i. e., those not represented by bonds, received anything from the foreclosure sale. A judgment was obtained on behalf of certain note holders, but the proceeds of the sale were not sufficient for them to participate in any division to creditors. Likewise they did not participate in any plan of reorganization since their interests were "washed out" and eliminated by the foreclosure proceedings and resultant sale of the property to the secured creditors. Thus, after the receivership was closed, all of Transportation Company's property was in the hands of Peabody for the benefit of the participating unsubordinated bondholders who were now entitled to new first mortgage bonds secured by the property so acquired.

All of the property held by Peabody was then transferred to the plaintiff corporation, which was organized January 13, 1921. Thereafter, plaintiff issued to Peabody subject to the approval of the Interstate Commerce Commission, all of its common stock, except four director's qualifying shares. Plaintiff also issued

$1,945,856.34 face amount 20-year first mortgage bonds to those bondholders of the unsubordinated bonds who participate in the purchase of the property at the foreclosure sale with interest thereon to January 26, 1921.[1]

At the time plaintiff corporation was organized the properties acquired in the mortgage sale were set up on its books on the same cost basis which the properties had carried on the books of the Transportation Company, adjusted by additional property acquired from August 21, 1920, the date the sale was approved, to January 13, 1921, when plaintiff was formed.

The fixed assets, including land and other non-depreciable property acquired by the plaintiff, are summarized at book costs as follows:

Investments in road and equipment as of August 20, 1920, on the books of the Transportation Company ....$5,301,725.47

Properties acquired during the operations by H. B. Moore, as Receiver and on behalf of the purchaser, Augustus S. Peabody, August 21, 1920, to January 13, 1921:

Net additional purchases, as recorded ................     9,095.54

Oil storage tanks and docks acquired from Humble Oil Company under contract of June 11, 1919, and pursuant to decree of June 11, 1920, Par. 4(j):

Payments under contract during period $20,789.09

Liability assumed for balance due $117,376.04 ...........$  138,165.13

Oil storage tanks acquired from Vacuum Oil Company under contract March 30, 1920, pursuant to decree of June 11, 1920, Par. 4(1) .......................     10,299.66

Total property acquired January 13, 1921 ........ 5,459,285.80

The exact method of computing these costs is set out in finding 26 and will not be repeated here. It represents as nearly as possible an accurate computation of the actual book costs of such assets using the basis upon which they would have been carried by the transferor corporation, Transportation Company.

The plaintiff for the calendar years 1945 and 1946, made certain sales of property acquired from Transportation Company and reported the income therefrom. Also for those years plaintiff computed and claimed deductions for depreciation of assets obtained from the mortgage sale. Plaintiff used as a basis for computing its gain on the sales of property and the depreciation of the assets an original basis other than the basis the properties would have had in the hands of its predecessor corporation, Transportation Company. Thereafter the plaintiff filed claims for refund of taxes for the years 1945 and 1946 claiming that the correct basis from which to compute gain or loss and depreciation was the basis that the properties would have had in the hands of Transportation

1. Unsubordinated first mortgage bondholders of $1,621,500 face amount were awarded judgment June 11, 1920, of $1,875,524.19, which amount, together with interest thereon at six percent per annum until January 26, 1921, amounts to $1,945,856.34. All of these bondholders did not participate in the purchase of the property, but following the settlement on September 18, 1920, the remaining bonds were substantially all deposited and endorsed for participation in the new issue. Plaintiff also issued bonds to another party in the face amount of $38,443.66 for the purchase of a monorail system which had been leased but not owned by the Transportation Company and was not included in the foreclosure sale.

Company adjusted in accordance with the provisions of law. The claims of the plaintiff were denied by the Commissioner of Internal Revenue and it now brings suit in this court to recover the difference between the tax computed by using the basis of Transportation Company and the amount of tax paid by reason of using another allegedly erroneous basis.

By using the original cost basis of the property acquired at the time of its organization, January 13, 1921, i. e., the same basis at which it had been carried on the books of Transportation Company and adjusted for later expenditures, losses, wear and tear, etc., the plaintiff's net income would be reduced for the year 1945 by $22,716.07 and for 1946 in the amount of $26,726.23. This represents the difference between the net income computed by the Commissioner, using as the original unadjusted basis of the property the cost of such property to the plaintiff corporation at the foreclosure sale, and the unadjusted basis the property would have if plaintiff could use the basis of Transportation Company.

For support of its position that it may use the basis of Transportation Company, plaintiff points to sections 113(a)(7) and 114 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 113(a) (7), 114, which were in effect during the years 1945 and 1946. These sections provided in pertinent part as follows:

"Sec. 113. Adjusted basis for determining gain or loss—

"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—

\* \* \* \* \* \*

"(7) Transfers to corporation. If the property was acquired—

"(A) after December 31, 1917, and in a taxable year beginning before January 1, 1936, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or

more remained in the same persons or any of them, or

"(B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

\* \* \* \* \* \*

"(b) Adjusted basis. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided."

"(1) General rule.

"Proper adjustment in respect of the property shall in all cases be made—

"(A) for expenditures, receipts, losses, or other items properly chargeable to capital account, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years;

"(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this chapter or prior income tax laws. Where for any taxable year prior to the taxable year 1932 the depletion allowance was based on discovery value

or a percentage of income, then the adjustment for the depletion for such year shall be based on the depletion which would have been allowable for such year if computed without reference to discovery value or percentage of income;

"(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained;

\* \* \* \* \* \*

"Sec. 114. Basis for depreciation and depletion—

"(a) Basis for depreciation.

"The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. \* \* \*"

Plaintiff contends that it meets the requirements of section 113(a) (7) and is therefore entitled to use as the basis for determining gain or loss from the sale of assets acquired in the mortgage sale transaction the same basis as those assets had with Transportation Company. Also, since the basis for computing depreciation is the same as the basis determined under section 113(a), adjusted by section 113(b), plaintiff claims the right to Transportation Company's basis in determining, for tax purposes, the depreciation it is entitled to deduct on properties acquired at the sale. Plaintiff bases this contention on the premise that it acquired the property between 1917 and 1936, in connection with a reorganization, and immediately after the transfer, an interest or control in such property of more than 50 percent remained in the same parties.

It is undisputed that plaintiff acquired the property in question between December 31, 1917 and January 1, 1936, and to that extent it meets the requirements of the above provision of law. There remains for determination the questions

(1) whether the property was acquired by plaintiff "in connection with a reorganization," and if so (2) whether immediately after the transfer an interest or control in such property of 50 percent or more remained in the same persons who had owned the property prior to the transfer.

In order to determine whether there has been in fact a reorganization for the purposes of the internal revenue laws, we must look to the provisions of revenue law in effect at the time of the transfer in question. In this particular case the applicable law is section 202(c) (2) of the Revenue Act of 1921, 42 Stat. 227, providing that:

"(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

\* \* \* \* \* \*

"(2) When in the reorganization of one or more corporations a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization. The word 'reorganization,' as used in this paragraph, includes a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or of substantially all the properties of another corporation), recapitalization, or mere change in identity, form, or place of organization of a corporation, (however effected); \* \* \*".

Plaintiff says that the transaction hereinbefore described meets the qualifications of section 202(c) (2) because

the acquisition by it of "substantially all the properties" of the Transportation Company constituted such a reorganization subject only to the "continuity of interest" rule set forth by the Supreme Court in Pinellas Ice & Cold Storage Company v. C. I. R., 287 U.S. 462, 53 S. Ct. 257, 77 L.Ed. 428, and Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. In support of its position plaintiff cites Helvering v. Alabama Asphaltic Limestone Company, 315 U.S. 179, 62 S.Ct. 540, 541, 86 L.Ed. 775, where a reorganization was carried out through bankruptcy proceedings.

In the Limestone Co. case, supra, the Court dealt with the interpretation of section 112(i) (1) of the Revenue Act of 1928, 45 Stat. 791, 26 U.S.C.A. Int. Rev. Acts page 379, which was a successor provision to section 202(c) (2) of the 1921 Act. Section 112(i) (1) provided: "The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation * * *." It is apparent that no substantial change was made in the 1928 Act from those provisions found in the 1921 Act. The facts in the Limestone Co. case were that a creditors' committee proposed a plan of reorganization to which all noteholders with the exception of two assented. Under the plan a new corporation would be formed to acquire all of the assets of the old corporation with the stock of the new corporation being issued to the creditors in satisfaction of their claims. The old corporation went through bankruptcy and its assets were put up for sale by the trustee in bankruptcy and bid in by the creditors' committee. Stock was issued to the assenting creditors after the formation of the new corporation and the nonassenting creditors were paid off in cash. The court held that this was a reorganization under the Revenue Act of 1928, rejecting the argument that in order to meet the "continuity of interest" rule a substantial ownership interest in the transferee company must be retained by the holders of the ownership interest in the transferor. The Court went on to say that under such a rule there could be no reorganization in this case since the stockholders of the old corporation had been eliminated. The Court held that the creditors, at the time they invoked the processes of law to enforce their rights, stepped into the shoes of the old stockholders and that "The sale [bankruptcy] 'did nothing but recognize officially what had before been true in fact.' Helvering v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985, 987." Therefore a continuity of interest was maintained when the creditors received the stock in the new corporation to the exclusion of the old stockholders and junior creditors. It is also clear that the fact that title to the property sold may have passed to a trustee prior to the organization of a new corporation does not break the "continuity of interest" since this is merely a step in the reorganization.

■■■ We think that the record herein discloses a transaction very much like that presented in the Limestone Co. case. It is true, as defendant points out, that the creditors of plaintiff's predecessor did not receive all of the stock since the unsubordinated first mortgage bondholders received new bonds of the reorganized corporation. This, however, does not defeat a reorganization under the 1921 Act since there is no requirement, as there was in later years, that the transfer be solely for voting stock of the transferee corporation. The only requirement of section 202(c) (2) is that there be a merger or consolidation "of substantially all the properties of another corporation." As used in the statute, insolvency reorganizations are within the meaning of "merger" and "consolidation," Limestone Co., supra.

The 50 percent rule of section 113(a) (7) of the 1939 Code is met because the persons who had the rights of ownership in the old corporation continued to have such rights in the new corporation. The unsubordinated bondholders of the old

corporation, with their superior rights, got new first mortgage bonds of the reorganized corporation, while the junior creditor, Houghteling & Co., succeeded to the equity interest. All other junior creditors were washed out since their interests were inferior and nothing remained for them to share in. As the Tax Court said in Montgomery Building Realty Co. v. C. I. R., 7 T.C. 417:

> " * * * We think it follows that the transfer of control to the junior creditors upon insolvency and the ownership by them of the equity in the new corporation, subject to the assumption and continuation of the prior rights of the mortgage bondholders, effectively carried through in the reorganization the ownership and control which had already become an economic reality, and that under the rule of the Alabama Asphaltic case the reorganization and basis provisions are applicable. * * * "

The Montgomery case involved a slightly different factual situation, but nevertheless illustrates that in a transaction such as herein presented the code requirements are met for a corporate reorganization.

Defendant argues that plaintiff's transactions with its predecessor corporation are unlike the Limestone Co. case because there was no plan of reorganization. This argument is clearly refuted by the facts in this case and a reference thereto clearly shows that a definite plan of reorganization was proposed and in fact carried out.

Defendant also contends that plaintiff's transactions fall within other sections of the 1921 Act and the 1939 Code. This may well be so, but it in no way alters the fact that the transaction also falls within the corporate reorganization provisions of 202(c) (2) of the 1921 Act and 113(a) (7) of the 1939 Code. Defendant cites Helvering v. Cement Investors, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649, for support of its position.

A close reading of that case presents no conflict with our holding in this case. Cement Investors involved events occurring under the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 855, which required the exchange of property to be *solely* for voting stock of the new corporation. The Court held that even though the transaction involved therein did not amount to a corporate reorganization under the 1936 Act it could still qualify as a nontaxable transaction under another provision of law. It also appears that had the 1928 and 1921 Revenue Acts been in effect during the time that the transfer in Cement Investors took place, it would have been a corporate reorganization under those acts.

On the authority of Alabama Asphaltic Limestone Co., supra, we hold that plaintiff is entitled to use as the basis of the property transferred the same basis as that property would have had in the hands of its predecessor corporation, the Transportation Company.

A second issue is raised by the defendant with respect to the cost basis of the assets so transferred to the plaintiff by Transportation Company. We will not go into a lengthy discussion as to the proper method of computing costs. We have found that the costs as carried on the books of Transportation Company and transferred to the plaintiff represent an accurate figure (finding 23). Plaintiff is entitled to a reduction of its net income for the years 1945 and 1946 in the amounts of $22,716.07 and $26,726.23, respectively, and is therefore entitled to recover taxes paid thereon in the amount of $14,513.05, with interest thereon as provided by law to the date of payment on $1,650.22 thereof from September 20, 1946; on $7,436.21 thereof from December 11, 1946, and on $5,426.62 thereof from March 17, 1947.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER Judges, concur.