ATLAS OIL AND REFINING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 78879, 78880.   Filed July 14, 1961.

*William D. Crampton, Esq., Vincent H. Maloney, Esq.,* and *John P. Lipscomb, Esq.,* for the petitioner.

*John P. Higgins, Esq.,* for the respondent.

FISHER, *Judge:* The Commissioner determined deficiencies in income and excess profits taxes of Atlas Oil and Refining Corporation (hereinafter referred to as the petitioner or the new corporation) for the years and in the amounts as follows:

| Year | Tax | Deficiency |
|------|-----|------------|
| 1944 | Excess profits | $142,325.57 |
| 1945 | | 206,217.59 |
| 1947 | | 94,912.80 |
| 1948 | Income | 25,497.00 |
| 1949 | | 71,758.13 |
| 1950 | | 68,172.88 |

The deficiencies result principally from respondent's determination of the tax base with respect to properties acquired by petitioner pursuant to a corporate reorganization for purposes of determining depreciation, gain or loss, and equity invested capital.

The basic issue to be resolved is whether or not the reorganization, through which petitioner acquired the properties, was one to which section 112(b) (10), I.R.C. 1939, applies, resulting in the applicability of the provisions of section 113(a) (22) in determining the basis of such properties.

An issue raised in the petition as to the amount of a net operating loss carryback to the year 1949 from the year 1950 has been stipulated to depend upon our determination of the main issue.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are accordingly so found.

At all times material herein, the Atlas Pipeline Corporation (hereinafter referred to as Pipeline or the old corporation) was a Delaware corporation engaged in the refining of petroleum and marketing the products thereof. Its principal properties were a refinery in or near Shreveport, Louisiana, an office building in the city, and pipelines connecting the refinery with oil fields in East Texas, Arkansas, and Louisiana. At all times material herein Pipeline's capitalization was as follows:

| | |
|---|---|
| First mortgage bonds | $836,000 |
| Second mortgage bonds | $1,305,000 |
| Common stock (par $10) | 268,800 shares |

In 1939, Pipeline defaulted on the interest payments due November 1, 1938, on both its first and second mortgage bonds. Thereafter, on May 26, 1939, the indenture trustee for the first mortgage bondholders instituted receivership proceedings in the United States District Court for the Western District of Louisiana. The interests of the first mortgage bondholders were represented by a first mortgage bondholders' protective committee while those of the second mortgage bondholders were headed by a second mortgage bondholders' protective committee. On August 17, 1939, the court directed a public sale of the properties of Pipeline and fixed an upset price of $1,200,000. The first mortgage bondholders were primarily interested in the sale, while the second mortgage bondholders, acting through their protective committee, vigorously opposed any sale at such a price, on the ground that such a sale would disregard their equity in the properties of Pipeline. The receiver obtained no bids for Pipeline's properties, and no sale was effected. Thereupon on September 20, 1939, Pipeline

filed a petition with the court for reorganization under chapter X of the National Bankruptcy Act, as amended, and a trustee was appointed.

As of May 1, 1941, the accrued and unpaid interest of Pipeline's first mortgage bonds amounted to $125,400, and the accrued and unpaid interest on its second mortgage bonds amounted to $195,750.

On May 1, 1941, Pipeline owed $105,379 to secured creditors and $400,000 to unsecured creditors. Included in the latter is the amount of $141,839 owed to the State of Louisiana for motor fuel taxes. Pipeline had filed a surety bond with the State in the amount of $70,000 as security for the payment of said taxes.

On March 24, 1941, the trustee submitted to the court a plan of reorganization of Pipeline (hereinafter referred to as the plan). The plan as filed, insofar as material herein, contemplated the following transactions:

(a) A new corporation would be organized by various owners of crude oil production in the Magnolia Field in the State of Arkansas.

(b) This corporation would issue 5,000 shares of common stock of the par value of $20 per share to these owners (hereinafter referred to as the Purchasing Group) in exchange for $100,000 in cash. The purchasing group was to enter into a contract to supply oil to the corporation for a period of three years. The purchasing group was also to extend cash or credit to the corporation, if needed, not in excess of $200,000.

(c) The new corporation was to issue new first mortgage bonds dated May 1, 1941, in the face amount of $1,011,400 and bearing interest at 4½% per annum from that date. Of these bonds, $961,400, principal amount thereof, was to be delivered to the holders of the first mortgage bonds of Pipeline in exchange for such bonds. Of this amount, $836,000 thereof was to represent the principal of the old bonds of Pipeline and $125,400 the interest thereon to May 1, 1941. The remaining $50,000 of such bonds would be issued to the American Locomotive Company for $50,000 in cash. Said bond issue was to be secured by a first mortgage and lien on the tangible property of Pipeline.

The bonds to be issued in replacement for the first mortgage bonds were to have reduced security, the maturity was to be extended, the annual sinking fund requirements were to be reduced from $100,000 to $50,000, a cash deposit of $150,000 held by the indenture trustee was to be surrendered, and the interest rate was to be reduced from 6% to 4½%.

(d) The second mortgage bondholders of Pipeline were to participate in the plan as secured creditors to the extent of the value of the security behind their bonds and as ordinary creditors for the balance of their claims in excess of such security. In exchange for both their bonds and rights as ordinary creditors, the second mortgage bondholders were to receive on a pro rata basis 4,350 shares of 4% preferred stock of the new corporation of a par value of $100 per share. Certain of Pipeline's second mortgage bonds held by Pipeline were to be excluded from the participation and cancelled. The value of the security of the second mortgage bondholders in the property and assets of Pipeline was determined by the court to be $435,000.

(e) The holders of the preferred stock of the new corporation were to have the right to elect one director and under certain conditions relating to the non-

payment of dividends were to have the entire voting rights except as to the election of two directors.

(f) Claims of the United States in the amounts approved by the courts were to be paid in full as well as claims of the States of Louisiana, Texas, and Arkansas, and political subdivisions thereof for ad valorem taxes.

(g) Other ordinary creditors of Pipeline were to receive ten cents on the dollar in cash in payment of their claims as proven and allowed by the court, without interest.

(h) No distribution was to be made to the stockholders of Pipeline because of its insolvency.

(i) All assets of Pipeline with certain minor exceptions, including cash for the payment of allowances in the reorganization proceeding and cash claims, were to be vested in the new corporation.

The plan as submitted by the trustee to the court was the result of vigorous bargaining and negotiations between the parties concerned. In working out the plan, the interests of the first mortgage bondholders, the second mortgage bondholders, and the purchasing group were adverse to each other. Throughout, the position of the first mortgage bondholders was that they were adequately secured by their lien on Pipeline's properties whether or not the business of the company was continued. The second mortgage bondholders, on the other hand, wanted to see Pipeline reorganized and continued as a going concern. Initially, the second mortgage bondholders in their negotiations attempted to secure a creditor's interest in petitioner in exchange for their equity in Pipeline. This they were unable to obtain because the purchasing group was adamant that the new corporation (petitioner) could not stand further indebtedness and the charges thereon in addition to that represented by the first mortgage bonds. Eventually, the parties agreed upon preferred stock to represent the second mortgage bondholders' interest. After further negotiations the amount of preferred stock to be issued to these bondholders was fixed at $435,000 par value represented by 4,350 shares. This amount was considered by the purchasing group to represent the equity ownership of the second mortgage bondholders in Pipeline's assets. It amounted to one-third of the face amount of the outstanding second mortgage bonds.

On March 24, 1941, the judge of the court fixed April 7, 1941, as the time for a hearing on the plan and for consideration of any objections thereto. He also directed that notice of the hearing and a summary of the plan be sent to interested parties including the Securities and Exchange Commission.

Under date of June 2, 1941, the Commission rendered an advisory report on the plan. After an exhaustive review of what it considered the pertinent and salient facts, the Commission concluded that the plan was neither fair nor feasible and recommended that it not be approved.

Under date of July 14, 1941, the court issued an opinion, filed the following day, in which it declined to accept the view of the Commission on the fairness or feasibility of the plan. Accordingly, by order dated July 16, 1941, the court, among other things, approved the plan and set August 30, 1941, as the last day upon which the creditors of Pipeline might accept it in writing. By supplemental decree dated July 16, 1941, the court made certain findings of fact, among which were the following:

(13) The Plan of Reorganization was evolved by a series of conferences and negotiations extending over more than a year. It is the result of adversary trading in which all interests were competently represented. It is the product of the combined judgment and effort of the trustee and of counsel and committee representing the First and Second Mortgage Bondholders. It has been approved and is recommended to the Court by all of them as being both fair and feasible.

Subsequent to the order of the court on July 16, 1941, and by August 9, 1941, the requisite number of creditors of Pipeline approved the plan as submitted to them by the trustee. Thereupon, on August 9, 1941, the court confirmed the plan and entered an order reading, in part, as follows:

(E) That title to the property dealt with by the Plan shall be vested in the new company on such date as the court may subsequently determine and said property when transferred by the Trustee to the new company shall be free and clear of all claims and interests of the said Debtor, its creditors and stockholders except such claims and interests as may otherwise be provided for in the order directing the transfer of the property.

Pursuant to the plan, petitioner was incorporated under the laws of Delaware on November 29, 1941. On December 26, 1941, petitioner issued 5,000 shares of $20 common stock to the purchasing group and received therefor $100,000 in cash. The purchasing group and petitioner, between January 1 and 9, 1942, entered into the contemplated crude oil purchasing contract and became bound by the terms and conditions of its proposal made to the trustee.

Pursuant to the plan, Pipeline transferred to petitioner, effective as of December 31, 1941, its assets and properties with the exceptions specified by the court in its order of January 9, 1942.

Pursuant to the plan, petitioner issued between January 1 and 20, 1942, first mortgage bonds dated May 1, 1941, and due May 1, 1956, in the aggregate principal amount of $1,011,400 and bearing interest at the rate of 4½ percent per annum. Of this bond issue of petitioner, the amount of $961,400 thereof was dealt with in accordance with the plan as directed by the court in its said order of January 9, 1942. The remaining $50,000 of the bonds of petitioner were issued between January 1 and 20, 1942, to the American Locomotive Company for $50,000 cash as contemplated by the plan. The American

Locomotive Company had owned some of Pipeline's second mortgage bonds and thereby became a preferred stockholder in petitioner. As a result of negotiations between the parties, the American Locomotive Company agreed to purchase $50,000 of petitioner's first mortgage bonds so as to supply the new corporation with additional working capital and to protect its own interest as a preferred stockholder.

Pursuant to the plan, petitioner issued between January 1 and 20, 1942, 4,350 shares of 4-percent preferred stock of a par value of $100 per share. Said preferred stock was dealt with in accordance with the plan and as directed by the court in its said order of January 9, 1942.

Because of the insolvency of Pipeline, as determined by the court, the stockholders of Pipeline did not participate and were without interest in the plan, and received nothing thereunder.

On February 16, 1942, the court decreed the formal dissolution of Pipeline as of December 31, 1941. On June 26, 1942, the court decreed that all actions of the trustee taken pursuant to its order of January 9, 1942, in consummation of the plan including the transfer of assets of Pipeline to petitioner be approved.

The designations, powers, preferences and rights, and the qualifications, limitations, and restrictions of petitioner's preferred and common stock were set forth in petitioner's certificate of incorporation and were incorporated into the certificates themselves. Insofar as material to this proceeding they were, in substance, as follows:

(a) The holders of the preferred stock were entitled to receive, before any dividends on the common stock, dividends at the rate of 4% per annum payable quarterly, but which dividends during the first 33 months from the date petitioner acquired the properties of Pipeline were to be cumulative only insofar as actually earned, but thereafter fully cumulative whether or not earned.

(b) The holders of the common stock were to have all of the voting rights of the corporation except that the preferred stockholders were to have the right to elect one director and the holders of the first mortgage bonds the right to elect one director.

(c) The controlling vote rights set forth above were to remain unchanged during a period expiring 33 months from the date petitioner acquired the properties of Pipeline regardless of whether dividends on the preferred stock were earned or paid, but if after one year from the date of said acquisition petitioner should fail to pay dividends upon the preferred stock, which if computed at the rate of 4% per annum from the termination of the one-year period should equal or exceed 8% of the par value of the preferred stock, then without notice the entire voting rights were to pass to the holders of the preferred stock, except that the holders of the common stock and the first mortgage bonds were each to have the right of electing one director.

(d) If, however, dividends paid on the preferred stock reduced the unpaid dividends thereon to less than 8% of the par value, the original controlling voting rights were to revert to the holders of the common stock, subject to their revesting in the preferred stockholders dependent upon the payment of future dividends.

(e) Each holder of record of the common stock of petitioner was entitled to one vote for each share of common stock standing in his name on the books of the corporation, and each holder of record of preferred stock of petitioner, whenever entitled to vote, was entitled to one vote for each share of preferred stock standing in his name on the books of the corporation.

Included in the assets of Pipeline taken over by petitioner was a refinery located at Shreveport, Louisiana. Petitioner continued to operate the refinery until its sale in 1950.

The stock and securities of the new corporation under the plan would thus be held by the following persons:

| Capitalization | | Transferred to |
|---|---|---|
| First mortgage bonds | $961,400 | Old 1st mortgage bond-holders. |
|  | 50,000 | New interest for cash. |
| Preferred stock | 435,000 | Old 2d mortgage bond-holders. |
| Common stock | 100,000 | New interests for cash. |
| Total | 1,546,400 | |

Petitioner filed its income and excess profits tax returns for the taxable years 1944 through 1949, with the collector of internal revenue, New Orleans, Louisiana. For the taxable year 1950, petitioner filed its income tax return with the collector of internal revenue, Cleveland, Ohio.

OPINION.

The petitioner maintains the proper basis of the property it received pursuant to the reorganization in question is the same as the basis which such property had in the hands of the old corporation pursuant to section 113(a)(22), I.R.C. 1939. The application of this section in turn is dependent upon whether or not the reorganization was a tax-free reorganization under section 112(b)(10), I.R.C. 1939.

So far as material here, section 112(b)(10) provides that:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\*　　\*　　\*　　\*　　\*　　,　\*　　\*

(10) GAIN OR LOSS NOT RECOGNIZED ON REORGANIZATION OF CORPORATIONS IN CERTAIN RECEIVERSHIP AND BANKRUPTCY PROCEEDINGS.—No gain or loss shall be recognized if property of a corporation \* \* \* is transferred, \* \* \* in pursuance of an order of the court having jurisdiction of such corporation—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(B) in a proceeding under \* \* \* Chapter X of the National Bankruptcy Act, as amended,

to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such corporation

The reorganization, in essence, provided that the first mortgage bondholders of the old company were to receive new bonds in the face amount of the old bonds, plus accrued interest; that the second mortgage bondholders were to receive all of the preferred stock in an amount equal to what had been determined to be their equity interest; that all other creditors were to be discharged by the old corporation with the payment of various percentages of their claims; and that additional first mortgage bonds and common stock would be issued to new parties for cash.

Petitioner urges, and it is undisputed, that the transaction in issue satisfied every literal requirement of the statute—that the properties were transferred to petitioner pursuant to an order of the court having jurisdiction in the premises; that petitioner was organized and made use of to effectuate a plan of reorganization approved by such court; and that the transfer was in exchange solely for stock or securities of the new corporation. Respondent, however, challenges the tax-free status of the transaction on the ground that the so-called continuity-of-interest requirement was not met.

The continuity-of-interest rule was introduced by the United States Supreme Court in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462 (1933). Since the *Pinellas* case, it has been judicially recognized that a transaction may not qualify under some circumstances as a tax-free reorganization under the various revenue acts, even though the literal language of the statute is satisfied. *Le Tulle* v. *Scofield*, 308 U.S. 415 (1940); *Helvering* v. *Minnesota Tea Co.*, 296 U.S. 378 (1938).

The continuity-of-interest requirement was later included in the regulations. Section 29.112(b)(10)–1, Regs. 111, provides in part:

As used in section 112(b)(10), the term "reorganization" is not controlled by the definition of "reorganization" contained in section 112(g). However, certain basic requirements, implicit in the statute, which are essential to a reorganization under section 112(g), are likewise essential to qualify a transaction as a reorganization under section 112(b)(10). Among these requirements are a continuity of the business enterprise under the modified corporate form and a *continuity of interest therein on the part of those persons who were the owners of the enterprise prior to the reorganizaztion.* * * * [Emphasis added.]

The above regulation, insofar as the continuity-of-interest requirement has been expressly accepted by this Court as validly applicable to a section 112(b)(10) reorganization. *Chicago Stadium Corporation*, 13 T.C. 889, 896 (1949).

Whether there was sufficient continuity of interest between the old and the new corporation is the sole basis for dispute and the only issue to which we must address ourselves.

There have been many cases involving this problem, each being decided upon its own facts, and any attempt to summarize or discuss

them would unduly lengthen this opinion. As we understand the rationale of the cases, there is no ironclad rule or formula under which continuity of interest can be measured in every case. The main requirement is that the "former owners" must receive a definite and substantial equity interest in the transferee corporation measured by the value of the assets transferred. *Helvering* v. *Minnesota Tea Co.*, *supra; Southwest Natural Gas Co.*, 14 T.C. 81 (1950), affd. 189 F. 2d 332 (C.A. 5, 1951).

In the case of a solvent corporation reorganizing, the problem of determining the existence of continuity of interest is minimized. The stockholders, being the "former owners" must receive a substantial stock interest of the new corporation.

The problem arises, however, in the case of a reorganization of an insolvent corporation in determining who are the "former owners" who must receive a substantial stock interest to satisfy the continuity-of-interest requirement. In the usual insolvency reorganization, the stockholders are wiped out and only the creditors remain with an interest in the old corporation. Therefore, only the creditors will usually receive an interest in the new corporation.

In dealing with the obvious difficulty in the application of the continuity-of-interest rule presented in such a situation, the Supreme Court has held that the creditors of the bankrupt corporation, upon the initiation of a bankruptcy proceeding, may be deemed "former owners," with the result that the transfer of stock to them may permit compliance with the continuity-of-interest rule. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942). The Court stated at pages 183, 184:

[The full priority rule] * * * gives creditors, whether secured or unsecured, the right to exclude stockholders entirely from the reorganization plan when the debtor is insolvent. * * * When the equity owners are excluded *and the old creditors become the stockholders of the new corporation*, it conforms to realities to date their equity ownership *from the time when they invoked the processes of the law to enforce their rights of full priority*. At that time they stepped into the shoes of the old stockholders. * * * [Emphasis supplied.]

Respondent's first contention is that, upon the initiation of the insolvency proceedings, under the full priority rule of *Northern Pacific Ry.* v. *Boyd*, 228 U.S. 482 (1913), and the rule of *Alabama Asphaltic Limestone Co.*, *supra*, all of the equity of the old corporation vested in the first bondholders making them the only "former owners." This is based upon the fact that the upset price of the corporate assets was established to be $1,200,000 and that, under the full priority rule, after allowing for prior creditors and the first mortgage bond liability, there was no equity remaining for the second mortgage bondholders. He concludes that inasmuch as the first mortgage bondhold-

ers were the only "former owners," their failure to receive a stock interest in the new corporation caused an absence of any continuity of interest.

We agree with respondent that if the second bondholders did not give up any interest in exchange for their preferred stock, or stated in another way, if the bonds they held were totally worthless and they, therefore, retained no equity interest in the old corporation upon insolvency, they could not be used to link the two corporations because they could not be deemed "former owners." *Templeton's Jewelers, Inc.* v. *United States*, 126 F. 2d 251 (C.A. 6, 1942). The upset price which respondent relies on, however, has been determined to be ineffective as a gage of value and equities. *Northern Pacific Ry.* v. *Boyd, supra.*

In the *Northern Pacific Ry.* case one of the issues was to determine whether any equity remained in general creditors upon an insolvency reorganization. The upset price was $61 million, while the total bonded debt amounted to $157 million. The new corporation issued $190 million in new bonds to the old bondholders and to some creditors, and issued $155 million of stock to old stockholders. Not all of the creditors were discharged or given a chance to participate in the new corporation. Upon a suit by one of these creditors, the corporation contended (as does respondent here) that the general creditors retained no equity inasmuch as the upset price was insufficient to give them any equity after the bonded debt. This measure of equities, however, was held to be erroneous, the Supreme Court stating (pp. 507–508) :

the question must be decided according to a fixed principle, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale the property was insufficient to pay prior encumbrances. The facts in the present case illustrate the necessity of adhering to the rule. * * *

It is insisted, however, that * * * the bid at public outcry, * * * established that the property was worth less than the encumbrances of $157,000,000, * * *. But there was an entirely different estimate of the value of the road when the reorganization contract was made. For that agreement contained the distinct recital that the property to be purchased was agreed to be "of the full value of $345,000,000, payable in fully paid non-assessable stock and the prior lien and general lien bonds to be executed and delivered as hereinafter provided."

The fact that at the sale, where there was no competition, the property was bid in at $61,000,000 does not disprove the truth of that recital, and the shareholders cannot now be heard to claim that this material statement was untrue and that as a fact there was no equity out of which unsecured creditors could have been paid, although there was a value which authorized the issuance of $144,000,000 fully paid stock. *If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective,* for dividends or only for purposes of control. * * * [Emphasis supplied.]

A valuation for reorganization purposes requires, therefore, an appraisal of many factors which cannot be reduced to a fixed formula. It entails also to an extent a prediction of future events. Hence, an estimate, as distinguished from mathematical certitude, is all that can be made. *Consolidated Rock Co.* v. *DuBois*, 312 U.S. 510, 526 (1941). Recognizing the possible margin of error in any such prediction, in the absence of proof that the figure cannot be supported, we cannot say that, in the instant case, the District Court, which had all the pertinent facts before it, was not justified in determining that the value of the second mortgage bondholders' equity, upon reorganization, was $435,-000. See *Bessemer Limestone & Cement Co.*, 22 T.C. 303, 317 (1954). Furthermore, the record indicates that the plan so submitted to and approved by the District Court was the result of protracted arm's-length negotiations between conflicting economic interests. From this fact it may safely be assumed that the allocation so worked out provided each class of bondholders with an interest in the new company substantially in proportion to the amount of the equity which was to be surrendered therefor, and that no equities were recognized that did not in fact exist. *Montgomery Building Realty Co.*, 7 T.C. 417, 426 (1946) ; *Alcazar Hotel, Inc.*, 1 T.C. 872, 877 (1943).

We hold, therefore, that the $435,000 equity interest which was determined by the District Court to be in the second bondholders represented the interest which they in fact exchanged for the preferred stock, in a like amount, of the new company. Retaining an equity interest, these bondholders may therefore be deemed "former owners" and may supply the necessary continuity of interest.

Respondent next argues that, in all events, there was no continuity of interest inasmuch as the full priority rule was not rigidly adhered to. He cites the facts that the first mortgage bond interest rate and sinking fund requirements were decreased, thus failing to make this class "whole" before paying inferior creditors, and the fact that general creditors were paid a portion of their debts before the second mortgage bondholders were made "whole." While the failure to recognize strict priorities may, in some cases, have an effect on determining who are the equity owners for continuity-of-interest purposes, the transfer of an insubstantial amount to inferior creditors before prior creditors are fully paid does not per se destroy continuity of interest. Indeed, one conclusion which may be drawn from this is that the second mortgage bondholders (being superior to these creditors) should have been given a *larger* equity interest. If a prior creditor however agrees to yield a small amount of his claim in the hope of settlement, it will have no effect on the tax-free nature of the reorganization. *Claridge Apartments Co.*, 1 T.C. 163, 171 (1942), reversed on other issues 138 F. 2d 962 (C.A. 7, 1943), reversed on other issues

323 U.S. 141 (1944). A situation where this would be important is presented when continuity of interest depends upon the presence of an equity interest in these inferior creditors. Such is not the situation here.

The lowering of sinking fund requirements or interest rates on bonds of top priority creditors where inferior creditors participate is also not a violation of the full priority rule sufficient to destroy continuity of interest. Such reductions are mere practical adjustments which are at times necessary in order to relieve the usually overburdened corporation of its fixed debt requirements. *Montgomery Building Realty Co., supra; Group of Investors* v. *Milwaukee R. Co.*, 318 U.S. 523 (1943), where it was said (pp. 565–566):

compromises, settlements, and concessions are a normal part of the reorganization process. * * * And in discussing the method by which creditors should receive "full compensatory treatment" for their rights, we emphasized, as already noted, that "Practical adjustments, rather than a rigid formula, are necessary." * * * It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. *Whether in a given case senior creditors have been made whole or received "full compensatory treatment" rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts.* [Emphasis supplied.]

Cf. *Consolidated Rock Co.* v. *DuBois, supra* at 528.

In the alternative, respondent, conceding for the purposes of argument that the second mortgage bondholders are deemed former owners for continuity-of-interest purposes, attacks the plan on a different front. First, he maintains that there is a requirement that a substantial percentage of the "former owners" of the old corporation *participate* in the equity distribution of the new corporation. See *Adamston Flat Glass Co.*, 7 T.C. 493, 505 (1946), affd. 162 F. 2d 875 (C.A. 4, 1947); *San Antonio Transit Co.*, 30 T.C. 1215, 1225 (1958), appeal dismissed (C.A. 5, 1959); *Reilly Oil Co.*, 13 T.C. 919 (1949), affd. 189 F. 2d 382 (C.A. 5, 1951).

As a minor premise he contends that under the rule of *Alabama Asphaltic Limestone Co., supra, both* the first and the second bondholders automatically became equity owners of the old corporation upon the institution of the bankruptcy proceedings, the latter possessing about one-third of the equity interest. Therefore, he concludes, inasmuch as only one-third of the "former owners" came out of the reorganization with an equitable interest in the new corporation, there was an absence of substantial participation by them and, therefore, insufficient continuity of interest between the two corporations.

It is clear that the bonds received by the first mortgage bondholders do not constitute a proper equitable interest for continuity-of-interest purposes. *Le Tulle* v. *Scofield*, 308 U.S. 415 (1940). It is equally clear that the preferred stock received by the second mortgage bondholders, albeit nonvoting, is a valid proprietary interest upon which continuity of interest may be based. "The owner of preferred stock is not without substantial interest in the affairs of the issuing corporation, although denied voting rights. The statute does not require participation in the management of the purchaser * * *." *Nelson Co.* v. *Helvering*, 296 U.S. 374, 377 (1935). See *Schweitzer & Conrad, Inc.*, 41 B.T.A. 533, 541 (1940). The Code also does not require that all of the new stock go to former owners. Since the furnishing of some new capital is almost invariably necessary in an insolvency reorganization, few such reorganizations would qualify for a tax-free status if the appearance of new capital reflected in the new equity interest were automatically to destroy continuity of interest. The important fact is that none of the consideration paid to petitioner for this participation moved from the new interests to the old equity holders. *Case* v. *Los Angeles Lumber Co.*, 308 U.S. 106, 117 (1939). This leaves us with the question of whether the second mortgage bondholders *alone* may provide the necessary continuity of interest. While their interest in the corporation amounted to approximately one-third of the corporate value, we need not determine if one-third participation on the part of "former owners" is sufficient for continuity-of-interest purposes, since it has been held, under situations similar to that in the instant case, that the protected bondholders who maintain their status in the new corporation are not deemed "former owners" and thus, need not participate in the equity distribution of the new company. Only the second mortgage bondholders whose interest has been affected by the insolvency, become the equity owners and must participate in the new stock issuance. *Montgomery Building Realty Co.*, 7 T.C. 417 (1946).

In the *Montgomery* case, as in the instant case, the greatest percentage of the liability of the insolvent corporation was to bondholders who retained their status in the new corporation. In holding that the bondholders were not equity owners for this purpose and therefore need not participate in the equity distribution, we said (p. 425) :

True, new stock was not issued here to all the old creditors, but only to the holders of unsecured claims * * *. The upshot [of the full priority rule] is that first mortgage bondholders having a prior lien on property sufficient to satisfy their claims are entitled to maintain that position and to be placed ahead of creditors holding unsecured claims or subordinate liens. * * * Stated somewhat differently, if the first and second mortgage bondholders were sufficiently protected by the continuation of their lien and the assumption of their bonds, * * * the remaining value must have belonged to the general creditors.

who under the *Alabama Asphaltic* rule, thereupon became the equity owners. * * *

See also *Texas City Terminal Ry. Co.* v. *United States*, 138 Ct. Cl. 739, 152 F. Supp. 227 (1957).

In the two cases referred to immediately above, the courts, for participation purposes, determined where the equity *in fact* vested rather than stating that all of the equity ipso facto vested in all of the creditors. It is only the class of creditors of the insolvent corporation who had in fact stepped into the shoes of the old stockholders *under established priority rules* that must be substantially represented in the equity distribution of the new corporation.

Respondent contends that the reasoning in the *Montgomery* case, which we follow here, is contrary to the *Alabama Asphaltic* case.

As stated before, the *Alabama Asphaltic* rule states that *when the "old creditors become the stockholders of the new corporation, it conforms to reality to date their equity ownership from the time when they invoked the process of the law to enforce their rights of full priority. At that time they stepped into the shoes of the old stockholders."* (Emphasis added.) 315 U.S. at 183–184. We do not believe that respondent's interpretation of the *Alabama Asphaltic* rule is here applicable. To the extent material to the instant case, we regard *Alabama Asphaltic* as holding no more than that continuity of interest is preserved notwithstanding the elimination of an insolvent corporation's stockholders. *San Antonio Transit Co., supra* at 1225. A careful review of the rule discloses that not *all* creditors surviving the insolvency become ipso facto equity owners. The effect of the rule is merely that creditors who have a bona fide interest remaining *who in fact receive stock in the new corporation*, by relation back, can be deemed to have been equity owners at the time of the transfer, so as to be capable of satisfying the continuity-of-interest requirement that stock go to former owners. While "effective command" over the properties in an insolvency proceeding is necessary to change the creditors into equity owners to satisfy continuity of interest, the fact that a protected class may have had "effective command" over the assets in such proceedings will not *make* them equity owners for participation purposes if they do not in fact exercise their right to participate in the equity distribution of the new corporation. *Maine Steel, Inc.* v. *United States*, 174 F. Supp. 702 (D. Me. 1959).

Inasmuch as there is no requirement that any surviving creditor retain his status in the new corporation, and they are all permitted, although fully protected, to share in the new stock distribution, all creditors *receiving stock* may be deemed "former owners" at the time they receive it in determining whether the continuity-of-interest rule is satisfied.

In the situation where the value of the assets is *less* than the amount owed to the top priority creditors, there is no problem. The entire interest of the corporation, equity or debt, must vest in them whether they in fact receive stock in the new corporation or not. There is no excess which can overflow on to other creditors. They are the only ones who can be deemed former owners whether they receive stock or not, and the retention of their status in the new corporation (the stock going to outside interests) will cause an absence of continuity of interest. *Chicago Stadium Corporation, supra.*

When there are two or more classes of creditors surviving the insolvency, however, there is some room for determination as to which are the "former owners" depending upon the options taken by the creditors. When fully protected bondholders *retain* their status in the new corporation, the equity will vest in the lowest unprotected creditor. See Rev. Rul. 59–222, 1959–1 C.B. 80. It is that class which must substantially participate in the new stock distribution. *Adamston Flat Glass Co.*, 7 T.C. 493, 505 (1946), affd. 162 F. 2d 875 (C.A. 4, 1947).

While the *Alabama Asphaltic* rule gives the first bondholders the right to participate in the new stock distribution, and thereby be deemed "former owners," there is no foundation for the requirement that they must so participate when equity remains in other creditors. While the relationship of debt to equity may be important for other purposes, it would be clearly unreasonable to infer a requirement, as respondent in effect does, that debt be reduced in an insolvency reorganization.

The general legislative purpose behind the nonrecognition of gain or loss arising out of certain corporate reorganizations is to postpone the taxable event when there are minimal changes in investments, and the former owner's money is still tied up in the same kind of investment as that in which it was originally invested. *United Gas Improvement Co. v. Commissioner*, 142 F. 2d 216 (C.A. 3, 1944), affirming 47 B.T.A. 715 (1942). While there are situations created by some insolvency reorganizations when it is necessary for bondholders to change their investment by receiving stock in the new corporation if they are to comply with the continuity-of-interest rule (i.e., when they are the only class retaining any interest in the insolvent corporation), a requirement that protected bondholders *must* do when an interest remains in other creditors would be unreasonable and contrary to the congressional intent that only minimal changes in the nature of their investment may be required.

We conclude, therefore, that when the first mortgage bondholders retained their status, all of the equity vested in the second mortgage bondholders and, since all of the latter received stock, the participation requirement is satisfied.

In the light of the foregoing, we are left with the final question of whether the second mortgage bondholders, as the "former owners," received a substantial proprietary interest in the new corporation measured by the value of the assets transferred.

The Supreme Court has never defined what is a "substantial" interest. Manifestly such a definition could not be precise, and in the final analysis, each case must rest upon its own peculiar facts.

The parties to the reorganization, with the approval of the District Court, based upon the value of the assets transferred, estimated that the equity interest (after deducting the first mortgage liability) was $435,000 and stock in this amount was given to the second mortgage. While we have no evidence as to the market value, the book value of the preferred stock would approximate $435,000 and the book value of the common stock would approximate the consideration paid or $100,000. Under this analysis the preferred stockholders received in excess of 80 percent of the book value of the total stock issued by the new corporation. This is clearly a substantial percentage. Indeed, the Supreme Court has found that the former owners acquired a substantial interest with only 7½-percent stock interest in the new corporation. *Helvering* v. *Minnesota Tea Co.*, 296 U.S. 378 (1935).

The above analysis is substantially the same as that made in *Commissioner* v. *Corpus Christi Terminal Co.*, 126 F. 2d 898 (C.A. 5, 1942), reversing on other grounds 38 B.T.A. 944 (1938). In that case the transferor corporation transferred all of its assets to a new corporation. In return the new corporation assumed liabilities of approximately $100,000 and issued 782 shares of preferred stock (declared value, $100) or a total of $78,200, the amount determined to be the remaining equity interest. One thousand shares of common stock were sold, 400 shares to the old company and 600 shares to new parties. The necessary continuity of interest was found, the court stated (p. 899) :

It also seems plain that the transferor owned more than a fifty per cent interest in the assets immediately after the transfer, since it then possessed preferred stock in the transferee corporation valued at $78,200, a sum *equivalent to the total value of the actual equity in the assets it transferred,* * * *. The only other owner of any interest in the transferee was the Pure Oil Company, which held common stock valued at $60. * * * [Emphasis added.]

The crucial factor, as indicated by the above case, is that the total equity of the transferor corporation (assets less assumed liabilities) is exchanged for a like amount of equity in the new corporation and that such equity is a substantial portion of the total equity of the new corporation. Inasmuch as the total equity in the old corporation in the instant case was $435,000 and preferred stock in this amount was given in exchange therefor, and that amount was a substantial portion of the total $535,000 stock issued by the new corporation, the necessary

691

continuity of interest has been maintained between the two corporations.

In addition to the above, we are mindful of the fact that section 112(b)(10) was enacted as a "relief" measure to save court-approved insolvency reorganization from being drowned in the sea of legal restrictions surrounding corporate reorganizations. See S. Rept. No. 627, 78th Cong., 1st Sess., p. 22. Also, see *San Antonio Transit Co.*, 30 T.C. 1215 (1958). We hold, therefore, that upon the facts before us, there was a sufficient continuity of interest between the two corporations to satisfy section 112(b)(10) and that petitioner is entitled to apply section 113(a)(22) in determining the basis of the property so acquired in the reorganization, and in determining equity invested capital.

An alternative contention was originally made by petitioner. Our decision, however, disposes of the proceedings and renders moot the question so raised.

*Decisions will be entered under Rule 50.*